McGINNIS, *Appellant*, v. GEORGE KNAPP & Co.

### DIVISION ONE.

1. **Libel:** QUESTION FOR JURY. Where the words complained of as libelous are susceptible of two meanings, one harmless and the other defamatory, it is for the jury to say in what sense the readers may have understood them.

2. ———: SUFFICIENCY OF PETITION. A petition in an action for libel alleged the publication in defendant's newspaper under the title, "The McGinnis Cohorts," and the further heading, "They rally round the Brewers' Flag in the Senate," of the language: "The distribution of the $50,000 slush fund sent here by the liquor interests may enable Senator McGinnis to make good his boast that he did not care whether the house passed the high-license bill or not, he could defeat it in the senate;" that the matter so published purported to be part of

| 109 | 131 |
| 116 | 242 |

| 109 | 131 |
| 122 | 373 |
| 125 | 527 |
| 59a | 231 |

| 109 | 131 |
| 153 | 212 |
| 153 | 214 |

| 109 | 131 |
| 164 | 303 |

| 109 | 131 |
| 167 | 47 |

| 109 | 131 |
| 174 | 486 |

a letter written to the paper by its special correspondent at the capital, where plaintiff was in attendance as a member of the senate, before which a bill to regulate intoxicants was then pending; that by said language the defendant charged plaintiff with bribery, or that he had knowledge of, and was willing to avail himself of, the use of money by others to defeat the bill; and that the article was false and malicious. *Held,* that the petition was sufficient on demurrer.

*Appeal from St. Louis City Circuit. Court.*

REVERSED AND REMANDED.

*Charles Nagel* and *Campbell & Ryan* for appellant.

(1) The head lines and text of the article published were defamatory, and being published of a public officer with reference to his office were libelous *per se,* and the petition stated a cause of action. *Legg v. Dunleavy,* 80 Mo. 558; *Johnson v. Dispatch Co.,* 65 Mo. 539; *Price v. Whitely,* 50 Mo. 439; *Kemble v. Sass,* 12 Mo. 499; *Hermann v. Bradstreet,* 19 Mo. App. 227; *Randall v. News Ass'n,* 44 N. W. Rep. (Mich.) 783; *Belknap v. Ball,* 47 N. W. Rep. (Mich.) 674; *Bourreseau v. Evening Journal,* 63 Mich. 425; *Catulla v. Kerr,* 11 S. W. Rep. (Tex.) 1058; *Bettner v. Holt,* 70 Cal. 270; *Larabee v. Tribune Co.,* 36 Minn. 141; *Sanderson v. Caldwell,* 45 N. Y. 398; *Hand v. Winton,* 38 N. Y. 122; *Cramer v. Riggs,* 17 Wend. 209; *Dollaway v. Turrell,* 26 Wend. 383; *Wilson v. Noonan,* 23 Wis. 105; *Stone v. Cooper,* 2 Denio, 193; *Littlejohn v. Greely,* 13 Abb. Pr. 41; *Thomas v. Croswell,* 7 Johns. 264; *Negley v. Farrow,* 60 Md. 158; *Neeb v. Hope,* 111 Pa. St. 145; *Russell v. Anthony,* 21 Kan. 450; *Clements v. Lewis,* 7 Moore, 200; Odger on Libel, ch. 2, pp. 15, 16, 20, star p. 25. (2) *First.* The words used should be interpreted as they will naturally be understood by the average reader. *Caruth v. Richeson,* 96 Mo. 186–190; *Johnson v. Dispatch Co.,* 2 Mo. App. 565; *Bettner*

*v. Holt*, 70 Cal. 270, 275; *Dorland v. Patterson*, 23 Wend. 422–424; *Weil v. Schmidt*, 28 Wis. 137–141; *Wilson v. Noonan*, 23 Wis. 105; *DeMoss v. Haycock*, 15 Iowa, 149, 150; *Hankinson v. Bilby*, 16 M. & W. 442; Townshend on Libel, sec. 133; Odger on Libel, ch. 3, pp. 72–75. *Second.* The intention of the publication is to be interpreted by the jury with reference to the time, place, persons, circumstances and conditions with which it is connected. *People v. Croswell*, 2 Johns. 337–363; Townshend on Libel, p. 122, note 1; Odger on Libel, star p. 566, p. 436. (3) *First.* On demurrer the court will not give a mild construction to words, but will, if by any reasonable intendment it can, hold the words actionable. The rule that in actions of libel words must be taken *mitiori sensu* has been entirely abandoned. *Johnson v. Dispatch Co.*, 2 Mo. App. 545–568, affirmed 65 Mo. 539; *Patch v. Tribune Ass'n*, 38 Hun (45 S. C. N. Y.) 368; *J'Anson v. Stuart*, 1 T. R. 648; *Teacy v. McKenna*, Ir. R. 4 Com. Law, 374; Townshend on Libel, sec. 177, p. 216. *Second.* The demurrer admitted the malice and falsity of the charge and the meaning supplied by the innuendo. *Belknap v. Ball*, 47 N. W. Rep. (Mich.) 674. (4) The court has the right to instruct the jury that the language used, if unequivocal, is or is not libelous, but, where it is susceptible of either an innocent or defamatory meaning, the question of libel becomes one for the jury. Odger on Libel, ch. 3, pp. 144, 145; Townshend on Libel, secs. 281, 284, 286; Merrill on Newspaper Libel, p. 153; *Boogher v. Knapp*, 97 Mo. 122–129; *Twombly v. Monroe*, 136 Mass. 464–469; *Bergman v. Jones*, 94 N. Y. 51–63; *Hays v. Ball*, 72 N. Y. 418, 422; *Sanderson v. Caldwell*, 45 N. Y. 398; *Van Akin v. Caler*, 48 Barb. 58–60; *Dollaway v. Turrell*, 26 Wend. 383; *Gribble v. Press Co.*, 34 Minn. 342; *Woodberry v. Knickerbocker*, 31 Minn. 268–270;

*Elsworth v. Hays*, 37 N. W. Rep. 249–252; *Belknap v. Ball*, 47 N. W. Rep. 674, 676; *Sullings v. Shakespeare*, 46 Mich. 408, 414; *Edwards v. Chandler*, 14 Mich. 471–477; *Beazley v. Reid*, 68 Ga. 380–382; *Foval v. Hallet*, 10 Brad. 265–269. (5) The common-law rule that the question of whether or not ambiguous language is libelous should be submitted to the jury is made imperative in Missouri by our constitution (art. 2, sec. 14), which provides "that in all suits and prosecutions for libel * * * the jury, under the direction of the court, shall determine the law and the fact."

*Lubke & Muench* also for appellant.

The question in the case at bar is, was the language published by the defendants of and concerning the plaintiff, he being at the time a state senator, and there being pending before the senate a bill to regulate intoxicants, libelous. All the facts recited in the petition were admitted by the defendant's demurrer. This includes an admission that the language in question was published of and concerning plaintiff, and that the language was false, malicious and without justification. R. S. 1879, sec. 1591; *Price v. Whitely*, 50 Mo. 439; *Sass v. Keemle*, 12 Mo. 500; *Boogher v. Knapp*, 97 Mo. 122.

*Boyle, Adams & McKeighan* for respondents.

(1) The publication complained of does not charge anything of a libelous character. It does not tend to blacken the reputation of the appellant or to expose him to public hatred or contempt, or ridicule, which it must have done in order to be libelous and actionable. *Price v. Whitely*, 50 Mo. 439. Words are to be construed and taken by the court in the sense in which the words are or would be received by the world. *Hudson v. Garner*, 22 Mo. 423. When words are indifferent and equally liable to two distinct interpret-

ations, courts construe them in the mildest sense. *In mitiori sensu.* *Johnson v. Dispatch Co.*, 65 Mo. 540. There must be a specific imputation cast upon the plaintiff, sufficient to injure him. *Caruth v. Richeson*, 96 Mo. 186. The court must put itself in the position of the hearer or reader, and determine the sense or meaning of the language, according to its natural construction. Townshend on Slander & Libel, sec. 133. If, however, the language is unambiguous, the court must determine without reference to how those to whom it was published understood it, or what was meant by the publication. Townshend on Slander & Libel, sec. 140. The rule is that the natural meaning is to be taken, and if in that view the language will bear a non-actionable meaning equally as well as an actionable one, the courts will adopt the non-actionable. Townshend on Slander & Libel, sec. 142. (2) The pleader cannot by innuendo enlarge or change the sense of the published words. *Hudson v. Garner*, 22 Mo. 423. An innuendo is merely explanatory of the subject-matter sufficiently explained before; it cannot extend the sense of words beyond their own meaning. Townshend on Libel & Slander [4 Ed.]161, note 1. It is not the legitimate office of an innuendo to beget an action. Townshend on Libel & Slander, sec. 335.

SHERWOOD, P. J.—Action for libel. The petition in the cause, omitting caption, is as follows: Plaintiff alleges and states that he is a resident and citizen of the city of St. Louis, by occupation an attorney at law, and that he is also a member of the state senate of the state of Missouri, and was such member of said state senate on the twelfth and thirteenth of April, A. D. 1889; that defendant is a corporation, and is engaged in the publication, at said city of St. Louis, of the daily newspaper called *The St. Louis Republic*,

and that defendant was such corporation and published said newspaper on the twelfth and thirteenth of April, A. D. 1889; that, heretofore, on the thirteenth day of April, A. D. 1889, defendant, in the issue of the said newspaper of said date, published of and concerning plaintiff, under the title, "The McGinnis Cohorts," and the further heading, "They Rally 'Round the Brewers' Flag in the Senate," the following language: "The distribution of the $50,000 slush fund, sent here by the liquor interest, may enable Senator McGinnis to make good his boast, that he did not care whether the house passed the high-license bill or not, he could defeat it in the senate;" that the said matter so published by defendant was part of a letter purporting to have been written to defendant by its special correspondent at Jefferson City, April 12, 1889; that at said time plaintiff was in attendance at said city of Jefferson, the capital of said state of Missouri, as a member of the state senate, discharging his duties as such; that there was then pending before said state senate a bill entitled, "An act to regulate the sale of intoxicants," the same being substitute for house bills numbers 145, 759, 86, 102, 188, 168, 360 and 245; that, in and by said language hereinbefore set out, defendant charged, and its said special correspondent charged, that plaintiff had been guilty of bribery, or was offering bribes, or was ready to offer bribes to other members of said state senate, to induce them to vote against said bill, or that plaintiff then had knowledge that $50,000 had been unlawfully offered or used to induce members of said state senate to vote against said bill, and that plaintiff, having such knowledge, then and there approved of or consented to such unlawful act, and was ready and willing to avail himself thereof in accomplishing the defeat of said bill by said state senate, or that (plaintiff) aided and abetted the said alleged unlaw-

ful use of said alleged fund of $50,000; that the said language aforesaid was and is libelous; that the same was and is false; that the same was and is malicious; that there was no justification therefor, as defendant and its said correspondent well knew; that plaintiff, on April 15, 1889, demanded of defendant a retraction of the said language and charges therein contained, but the defendant to make such retraction declined; and that, by reason of the premises, plaintiff has been injured and damaged in the sum of $50,000, for which and costs he now prays judgment.

The defendant corporation interposed the following demurrer:

" Now comes the said defendant and demurs to the amended petition of said plaintiff, and assigns, as grounds of demurrer thereto, that the alleged publication set out in said petition does not, by any reasonable intendment or construction, charge plaintiff with having been guilty of bribery, or with having offered bribes, or with having been ready to offer bribes to other members of the state senate of Missouri, to induce them to vote against the bill set out in said petition; nor does said publication, by any reasonable or fair intendment or construction, charge plaintiff with having received $50,000, or any other sum, as a bribe for his own or the votes of other members of said state senate of Missouri, in respect to said bill set out in said petition, or with being guilty of any of the other things charged in the *innuendoes* of said petition.

" *Second.* Said alleged publication set out in said plaintiff's petition does not state any libelous or defamatory matter or thing against said plaintiff, either personally or as a member of the state senate of Missouri.

" *Third.* Said petition does not state facts sufficient to constitute a cause of action against this defendant."

"Wherefore, the defendant prays the judgment of the court, whether or not it shall further answer said petition."

The trial court adjudged the petition insufficient in law, and the plaintiff declining to plead further final judgment was entered on the demurrer, and the plaintiff appeals.

Our statute defines libel to be: "A libel is the malicious defamation of a person, made public by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath, or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, or any malicious defamation, made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives and friends." 1 R. S. 1889, sec. 3869. This section was enacted in 1879, Revised Statutes of that year, section 1590, and finds a place under the head of "crimes and punishments," and perhaps it would not strictly extend to *civil* actions, except in so far as it might be found correct and in conformity to definitions formulated by eminent jurists and authors. The attempts, however, to define a libel, though practically innumerable, have never been so comprehensive and accurate as to comprehend all cases that may arise. Townshend's Slander & Libel [4 Ed.] sec. 20. And such attempts in this regard in some degree resemble similar attempted definitions of fraud.

A definition which has met with frequent approval is that given by PARSONS, C. J., in *Commonwealth v. Clapp*, 4 Mass. 163: "A libel is a malicious publication, expressed either in printing or writing or by signs and pictures, tending either to blacken the memory of one dead, or the reputation of one who is alive, and expose him to public hatred, contempt or ridicule."

Frequent approval has also been bestowed on a definition uttered by ALEXANDER HAMILTON, *arguendo*, in *People v. Croswell*, 3 John. Cas. 353: "A libel is a censorious or ridiculing writing, picture or sign, made with a mischievous and malicious intent towards government, magistrates or individuals."

But it is immaterial for the purposes of this case which of the aforesaid definitions enunciated in the cases cited be adopted. Taking them to be sufficiently accurate and comprehensive for the present instance, let us apply them to the case at bar. Do the allegations of the petition in this case bring it within any of the definitions mentioned? And in this connection it must be remembered that the demurrer confesses the malice and falsity of the charge and also that the meaning supplied by the innuendo is the true meaning of the words charged to be libelous. *Belknap v. Ball*, 47 N. W. Rep: 674. And the rule that in actions for libel the words must be taken *mitiori sensu* is now for the most part repudiated. Townshend on Slander & Libel [4 Ed.] sec. 177, p. 216. , "The court on demurrer will see * * * if there is anything in the language which by reasonable intendment is actionable." *Ib.* Thus where the defendant wrote and published of the plaintiff, a hotel and job-coach proprietor by trade, and a Presbyterian by religion, that from mere motives of intolerance he had refused the use of his hearse for the funeral of his deceased servant, because the body was about to be interred in a Roman Catholic cemetery, held, overruling a demurrer to the declaration, that the court could not so clearly see that the language might not be actionable as to justify the withdrawal of the case from a jury." Townshend on Libel & Slander; *Teacy v. McKenna*, 4 Ir. R. Com. Law, 374.

In determining the force and effect of the alleged libelous words, though the meaning of the words used

cannot be extended by innuendo beyond the natural import of the words charged to be defamatory, yet in determining the meaning of the words of which complaint is made, it is entirely legitimate to consider the meaning to be imputed to them while at the same time considering the extrinsic facts and circumstances with which such words are connected. The author already quoted on this subject says: "For the purpose of its construction, language is to be regarded not merely in reference to the words employed, but according to the sense or meaning, which, all the circumstances of its publication considered, the language may be fairly presumed to have conveyed to those to whom it was published. The language is always to be regarded with reference to what has been its effect, actual or presumed, and the sense is to be arrived at with the help of the cause and occasion of its publication. The court or the jury is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language in question according to its natural and popular construction." Townshend on Slander & Libel, sec. 133. The construction, which it behooves a court of justice to put on a publication which is alleged to be libelous, is to be derived as well from the expression used, as from the whole scope and *apparent* object of the writer. *Spencer v. Southwick*, 11 Johns. 592; *Mason v. Stratton*, 17 N. Y. St. Rep. 302.

"Words are now construed by courts as they always ought to have been in the plain and popular sense in which the rest of the world naturally understand them." *Roberts v. Camden*, 9 East, 93. "It is quite clear, from all the modern authorities, that the court must read these words in the sense in which ordinary persons, or in which we ourselves, out of court, reading this paragraph, would understand them." TENTERDEN, C. J., in *Harvey v. French*, 1 Cr.

& M. 11.   We cannot pervert the words and alter the ordinary construction of them.   *Bynion v. Trotter*, St. 231.   The words must be understood by the court in the same sense in which the rest of mankind would understand them.   *Woolnoth v. Meadows*, 5 East, 463. "The law cannot be evaded by any of the artful and disguised modes in which men attempt to conceal libelous or slanderous meanings."   Townshend on Slander & Libel, sec. 133.   SHAW, C. J., in *Commonwealth v. Child*, 13 Pick. 198, said:   "The court will regard the use of fictitious names and disguise in a libel in the sense that they are commonly understood."   The same eminent jurist said in *Commonwealth v. Kneeland*, 20 Pick. 206:   "If, therefore, obscure and ambiguous language is used, or language which is figurative or ironical, courts and juries will understand it according to its true meaning and import; and the sense in which it was intended is to be gathered from the context and from all the facts and circumstances under which it was used."

Other authorities collated by the diligence of plaintiff's counsel abundantly support  the same view; a view which is sufficiently comprehensive to embrace within its scope the head lines of the articles now in litigation.   In *Sanderson v. Caldwell*, 45 N. Y. 404, 405, 406, ANDREWS, J., said:   "The charge against the plaintiff that he did a good thing in collecting soldiers' and sailors' claims  against the government at a fearful percentage, and that the 'blood money' he got in this way was supposed to be a 'big thing,' in connection with the fact that he was a lawyer, may fairly be construed as imputing to him unjust, dishonest and extortionate conduct  in  his  professional  capacity,  and justifies the meaning attributed to it in the complaint.

"The charge, that in his '*sober moments*' he prosecuted his business, authorized the inference that he

was in the habit of the immoderate use of intoxicating liquors; and the natural tendency and result of such a habit, in a person engaged in any business, and especially in professional business, is to unfit him for the proper discharge of it.

"The defendants, in judgment of law, intended to charge what their language implied, and to produce the injury which was the natural and proximate result of their act. They may not, in fact, have had in mind the particular meaning charged by the plaintiff, or intended the special injury produced; but the law, for remedial purposes, adjudges that a wrong-doer intends all the natural and proximate consequences of the wrong, and administers punishment and allows compensation upon this presumption.

"It is claimed, however, that special damages could not be recovered in this case for injury sustained by the plaintiff in his professional character, for the reason that the libel does not state or imply that the plaintiff was a lawyer, and, therefore, does not relate to him in that character; and for the additional reason that no actual damages to him in his profession were proved.   *   *   *   But the publication was libelous *per se*, without reference to the professional character of the plaintiff; and no authority has been cited, or has come to our notice, holding that the plaintiff cannot, in such a case, by extrinsic evidence connect the libelous words with his professional character, and recover the natural and proximate damages to him, in his profession, resulting therefrom.

"In an action for libel, the fact, that the words used had reference to the profession or business of the plaintiff, is not the substantive ground of the action. The actionable quality of the words used does not, in any case, depend upon that consideration."

In *Hart v. Wall*, 2 L. R. C. P. Div., the plain-

tiffs, vocalists, advertised in a theatrical newspaper as follows: "The sisters Hartridge have great pleasure in thanking Messrs. Chappell & Co., Messrs. Metzler & Co." (music publishers) "and others, for their kind, unhesitating permission to sing any *morceaux* from their musical publications." The defendant, who was interested as agent for the proprietors of the "stage right" of certain songs published by the firms mentioned, wrote to the proprietors of two music halls, at which the plaintiffs were engaged to sing, to the effect that the advertisement, if relied upon in every particular, was calculated to lead them to incur penalties under the copyright act, inasmuch as the publishers named had in some instances no power to give the alleged permission, and insinuating that music-hall singing was not calculated to create a demand for their musical publications.

Upon a motion to set aside a nonsuit, it was *held* that, inasmuch as the letters were reasonably susceptible of a construction which would make them libelous, the opinion of the jury ought to have been taken upon their meaning. Lord COLERIDGE, C. J., said: "The question is not whether the letters are susceptible of an innocent interpretation, but whether no libelous construction can reasonably be put upon them; for, if such a construction may reasonably be given to them, it is for the jury to say whether or not that is the true interpretation of them; and that question should not have been withheld from them."

In Odger on Libel & Slander the rule is stated to be (ch. 2, pp. 21, 22) that any written words are defamatory which impute to plaintiff that he has been guilty of any crime, fraud, dishonesty, immorality, vice or dishonorable conduct, or has been accused or suspected of any such misconduct, or which have a tendency to injure him in his office or engender an evil

opinion of him in the minds of right-thinking men; and, again, that it is libelous to impute to anyone holding an office that he has been guilty of improper conduct in the office, or has been actuated by wicked, corrupt or selfish motives.

The mere heading of an article may be libelous, though such article be the privileged report of legal proceedings. This was so ruled in *Clement v. Lewis*, 7 Moore, C. C. 200, where the heading was "Shameful Conduct of an Attorney."

In *Negley v. Farrow*, 60 Md. 158, ROBINSON, J., said: "This is an action of libel against the defendants, now appellants, editors and proprietors of a newspaper. Without setting out the libel at length, it is sufficient to say, it charges the plaintiff, elected as a republican senator from Washington county, with being under the influence and control of a corrupt democratic ring—with having participated in the republican caucus in nominating Mr. Pratt, as treasurer, and afterwards with having voted for Mr. Compton, the democratic ring candidate—with having aided the ring senators in defeating the bill for repealing the act authorizing the publication of the laws in newspapers, and by so doing had proved false to his political obligations and a traitor to his party, and has brought dishonor upon the republicans of Washington county who had elected him to the senate. It further charges him with having a contract to furnish stone to the canal, which was given to him by its president, Mr. Gorman, the head and front of the democratic ring, because he was a senator, and *'had a vote to give in the senate,'* and for no other reason. The article then concludes by saying, *'The fruits of the contract to furnish stone to lengthen locks on the canal are appearing. Look out for more.'* The question presented by the demurrer is, whether a publication making such charges as these in regard to the

official conduct of plaintiff is *in law a libel?* It is well settled that any publication which tends to injure one's reputation, and expose him to hatred or contempt, if made without lawful excuse, is libelous. It can hardly be necessary to say that such charges as these against the official conduct of the plaintiff, and the imputation of the base and sordid motives by which such conduct was governed, was calculated to injure his reputation and expose him to the contempt of all honorable men. Independent altogether of the innuendoes, the article on its face shows that these charges were made against the plaintiff, and we have no hesitation, therefore, in saying that the publication is in itself libelous."

In *Belknap v. Ball, supra*, the supreme court of Michigan held that to publish of a candidate for congress a false and malicious article representing him as saying: "I don't propose to go into debate on the tariff additions on wool, quinine and all the things, because I ain't built that way," printing the words in a coarse and bold imitation of his handwriting, with misspelled words, and an imitation of his genuine signature at the end, was libelous and not privileged. A demurrer to the petition was sustained in the court below, but the judgment was reversed on appeal.

The court, by GRANT, J., held the imputation of ignorance to a candidate for congress libelous, and said: "The character of the language set forth in the second count depends upon the meaning of the words, 'I ain't built that way.' The innuendo says that the defendant meant that plaintiff was too ignorant and imbecile to discuss the question, or to express in a decent way his intention not to discuss it. The province of the innuendo is to explain and give meaning to ambiguous language. If extrinsic evidence is required to ascertain its meaning the jury must determine that

VOL. 109—10

question. *Bourreseau v. Journal Co.*, 63 Mich. 425; 30 N. W. Rep. 376. The meaning of these words as used in the context is certainly not clear. The demurrer for the purposes of this case admits both the meaning supplied by the innuendo and the malice charged. When all the facts are placed before the court and jury upon the trial, the question whether or not the publication was libelous will be presented for their determination. The declaration makes out a case proper to be submitted upon the facts, which may be shown by the evidence."

In *Bettner v. Holt*, 70 Cal. 270, FOOTE, C., said: "In the interpretation to be placed upon language charging the publication of a libel, a court of justice is to put such a construction upon the words which it contains as may be derived 'as well from the expressions used as from the whole scope and apparent object of the writer.' *Spencer v. Southwick*, 10 Johns. 259; *Cooper v. Greely*, 1 Denio, 358. And not only is the language employed to be regarded with reference to the actual words used, but according to the sense and meaning under all the circumstances attending the publication which such language may fairly be presumed to have conveyed to those to whom it was published. So that in such cases the language is uniformly to be regarded with what has been its effect, actual or presumed, and its sense is to be arrived at with the help of the cause and occasion of its publication."

In the quite recent criminal case of *State v. Armstrong*, 106 Mo. 395, it was held to be a libel to send through the mail an envelope indorsed thereon in large letters, "Bad Debt Collecting Agency," and that the intent animating the sender of the letter was quite apparent. In that case GANTT, P. J., said: "This envelope on its face was designed to attract the atten-

tion of the public, and when the prosecutrix received these letters in these envelopes the fact was thereby published that this association was in correspondence with her for the purpose of collecting a bad debt; and we cannot shut our eyes to the necessary implication that she was a bad debtor; that she was not in the habit of paying her honest debts, and was unworthy of credit."

In *Twombly v. Monroe*, 136 Mass. 464, an article published in a newspaper was headed "The Locust Street Brutality Explained," and signed "The Landlord;" stated that "the woman" came to his house on a certain day, engaged rooms at a price named, and left at a certain time, having paid a certain sum; that about three months previously she decided not to come down stairs at all, and was consequently a great deal of trouble; that he told her if she would leave at a time named and give him a certain sum, he would give her a receipt in full, which she would not do; and that she kept her door locked, and would not give any satisfaction; and concluded as follows: "She is not a stranger here,—she never made friends. Can find out all about her by taking a little trouble." *Held*, in an action against the tenant by the landlord for libel, that a ruling, as matter of law, that the publication was not libelous or actionable, was erroneous; and that the question should have been submitted to the jury.

In that case FIELD, J., said: "If the words published are fairly capable of two meanings, one harmless and the other defamatory, it is a question for the jury in what sense readers may have understood them. * * * We are satisfied with the rule, that, at the trial of civil actions for libel, it is only when the court can say that the publication is not reasonably capable of any defamatory meaning, and cannot reasonably be understood in any defamatory sense, that the court can

rule, as matter of law, that the publication is not libel-ous, and withdraw the case from the jury, or order a verdict for the defendant. We cannot say that the publication in the case at bar does not impute to the plaintiff an intention to keep possession without paying rent; and that the words, 'She is not a stranger here, she never made friends. Can find out all about her by taking a little trouble,' do not convey an implication or insinuation that the plaintiff is considered unfit for friendly intercourse by her neighbors, and do not thus tend to expose her to obloquy; if so, the publication may be libelous. We think the presiding justice erred in ruling, as matter of law, that the publication was not libelous, and in not submitting the question to the jury.''

In *Price v. Whitely*, 50 Mo. 439, the following language was made the basis of an action: ''I found an imp of the devil, in the shape of Jim Price, sitting upon the mayor's seat.'' * * * ''And, now, sir, that imp of the devil and cowardly snail, that shrinks back into his shell at the sight of the slightest shadow, had the bravery to issue an execution against me.'' And the language was held libelous, the definition of libel heretofore quoted from *Commonwealth v. Clapp*, *supra*, being again quoted with approval, having already been quoted in a like manner in the earlier case of *Nelson v. Musgrave*, 10 Mo. 648.

Now, what would be the impression produced upon the mind of any reader of intelligence on perusing the article in question? Would it not have a tendency, and a direct tendency, to produce a feeling of contempt, a sense of ridicule and of blameworthiness on the part of the plaintiff? Could any fairminded reader on reading the article and its suggestive headlines say such was not its effect and its intended effect? But whether this was the intended effect or not is immaterial,

because the law will adjudge that the defendant corporation intended to produce the natural and proximate results of its act.   Nor need it have had in mind the particular meaning charged by plaintiff, or intended the special injury produced; for the law *in odium* of the wrongdoer, and for its own wise remedial purposes, adjudges that he intends those consequences which naturally attend as results of his wrong.   *Sanderson's Case, supra.*   Hatred, contempt and ridicule would naturally be produced by the words employed, and, therefore, they would be libelous *per se*, under the definitions already announced, and authorities cited and quoted.

But in reading the bare words of the libel it must be remembered that they, for the purposes of the demurrer, must be read and be deemed to have been read in close connection with and as parcel of the innuendoes.   Reading them in this way no possible ground can be left to doubt their libelous character. No room is left to doubt as charged in the innuendoes that it was intended by the article to convey the idea that the plaintiff was wholly unworthy of the high official position he was then filling and faithless thereto; that instead of representing his constituents he was representing the "liquor interest," and that he was associated on terms of great familiarity, if not of criminal intimacy, with those who would not hesitate to employ a "slush fund" of $50,000, wherewith by bribery to secure a sufficient number of votes in the senate to defeat the "high-license bill."

But it is immaterial, for the purposes of this case, absolutely to determine whether the article is libelous *per se* or not, because, under the authorities cited, if the language be ambiguous, the court should not take the case from the jury where one of the meanings of the article complained of is harmless and the other defam-

atory; but leave it to the jury in what sense the readers may have understood the words in question and the case will not be withheld from the jury unless it can plainly see upon the face of the record that the matter charged cannot in any way be libelous. In other words, the court will not make any *strained* inferences in favor of those who thoughtlessly or else maliciously touch with flippant lightness upon so sacred a thing as private character. And neither the great corporate newspapers of the day nor their special correspondents are above the law or its penalties, both civil and criminal, when they venture to' cast aspersions upon the reputation of others. If they will venture upon such hazardous experiments and tread in such dangerous pathways, they must stand prepared to prove the truth of the malicious charge or answer in damages to the party injured. And the penalties which the law provides for such acts cannot be defeated by evasions however skilful, or thwarted by artifices however subtle.

Whenever the libelous intent or seeming libelous intent appears though dimly and vaguely, as "through a glass darkly," the question becomes one for the jury to say whether the meaning was harmless or defamatory. Quotations from text-writers and from adjudged cases have been largely made in this opinion, not as being absolutely necessary to a correct conclusion in this cause, but as showing in the instances cited how varied and futile have been the attempts in times past to asperse private or public character, and still escape the penalties of the law.

Of course, all of the foregoing observations, with respect to the case at bar, must be regarded as bottomed on the allegations of the petition, which the demurrer is deemed to confess to be true.

Inasmuch as the petition stated facts to constitute a cause of action, it should have been held sufficient in law. The judgment will, therefore, be reversed and the cause remanded. All concur.