FARLEY, Respondent, v. EVENING CHRONICLE
PUBLISHING CO., Appellant.

**St. Louis Court of Appeals, May 16, 1905.**

1. **SLANDER AND LIBEL: Libelous Publication.** To publish an article concerning one charging him with dishonest conduct such as would tend to arouse the contempt of all classes of society for him, is libel without innuendo to expound its meaning.

2. ———: **Actionable Words.** Written or printed matter concerning another, communicated to third persons, may be actionable when it would not be actionable *per se* if spoken.

3. ———: ———: **Libel.** When written or printed matter is published of one which tends to blacken the reputation of such person or excite ridicule of wrath against him or destroy public confidence in him, it is actionable without proof of special damages.

4. ———: ———: **Malice.** The publication of false and libelous matter concerning a person is held to be malicious if it is without lawful excuse, that is, if it is not a privileged communication; and this is true though the libeler acted under a misapprehension of the facts, believing his statement to be true.

5. ———: ———: **Mistaken Identity.** Where the publisher of a newspaper published the picture of a person and printed in connection with it matter which was false and libelous as concerning him, but which was true concerning another person of the same name, under the mistaken belief that the picture belonged to the one of whom the statements were true, it was sufficient to warrant the inference that the libelous matter referred to the person of whom it was false and was sufficient to sustain a verdict in his favor, in an action against the publisher.

Appeal from St. Louis City Circuit Court.—*Hon.
O'Neill Ryan*, Judge.

AFFIRMED.

*Chester H. Krum* for appellant.

(1) Definition of libel ordinarily accepted: "A malicious publication expressed either in printing or writing, or by signs and pictures, tending either to blacken the memory of one dead or the reputation of one who is alive and expose him to public hatred, contempt or ridicule." Comm. v. Clapp, 4 Mass. 163. (2) In order to hold written words libelous the court ought to be able to see that a party's reputation was liable to be injured in some serious and material manner. Foster v. Berie, 38 Ill. App. 613; Achome v. Piper, 66 Iowa 694; Gallup v. Belmont, 62 Hun 618.

*Henry Walsh* for respondent.

### STATEMENT.

The defendant, a corporation, is engaged in publishing a daily newspaper in the city of St. Louis, called the St. Louis Chronicle. This is an action for damages for an alleged libel published of and concerning the plaintiff by the defendant in its newspaper. The supposed libelous article is as follows:

### "FARLEY, THE GREAT STRIKE-BREAKER.

"He is on hand in Chicago to meet his old enemies, the labor unions. Chicago, Nov. 12. 'Boss Farley,' the strike breaker and foe of labor organizations, is in Chicago. He was called here by the street railway company to assist it in moving cars in defiance of the strikers.

"In the past Farley and his followers have piloted cars through hostile crowds, and have faced the stones and bullets that almost invariably have accompanied car strikes.

"In all the strikes waged by street car employees for years past they have been confronted by 'Boss Farley' and his army, and in Chicago the struggle between

Farley and the leaders of the union will renew a contest that has been fought out, with varying issues, in many other cities.

"President W. D. Mahon, of the union, who has come to Chicago, has met Farley, and has gone down in defeat before him. General Organizer Clarence O. Pratt also has had experience with this man, who has chosen the most dangerous of all avocations.

"What these two officers do not know of Farley can be supplied by the local leaders in the different cities.

"Farley took out the first car in the Cleveland strike.

"Farley took out the first car in the St. Louis strike.

"Farley and his men handled the cars on strikes in Philadelphia, Brooklyn, Providence, New Orleans, Bridgeport, in Waterbury, Conn., and in unnumbered other struggles.

"Farley lives in the breath of battle. He carries two bullets received while on duty for street car companies, and has many scars of minor hurts. Yet, while saying that he grew into the business naturally, he also admits he likes it.

"The first encounter between the boss and the leaders of the Amalgamated Association was in Cleveland.

"The company for some days had been preparing to run its cars. At length the time came and the start was made. Farley operated the car, and he had not completed the run when he was surrounded by men and dragged away.

" 'If you will promise to get out of Cleveland in two hours you can have any reasonable sum of money' Farley was told.

"He agreed to the stipulation and swept the money into his pocket. Taking the first train he rode to a suburban station just beyond the corporate limits. But in three hours he was back at the company's headquarters and announced his readiness to run the second car.

"One of Farley's bullets was received in Cleveland in the progress of that same strike. The other came to him in a small Pennsylvania town."

The petition charges that the above article was published of and concerning the plaintiff willfully, wantonly and maliciously, and caused damage to plaintiff's reputation in the city of St. Louis, held him up to the scorn and ridicule of his acquaintances, endangered his life, and entailed great mental anguish and distress; for all of which he prayed damages in the sum of $10,000.

It will be observed that the article complained of does not contain the given name of the Farley referred to; and that this plaintiff was the person intended was shown only by the circumstance that his picture was printed in the paper in connection with the article, with the words "Boss James Farley" printed under the picture. The plaintiff for years has been a resident of the city of St. Louis, and all the evidence goes to show is a quiet and orderly citizen. He is at present a deputy in the office of the recorder of deeds. Previously he was deputy marshal for a while and for six or seven years was foreman of the Mound City Coupe, Livery & Messenger Company, and prior to that employment, foreman of the Jesse Arnot Livery Company. He never had anything to do with strikes or strike-breaking. It appears that a man by the same name (James Farley) was known over the country at large as a noted breaker of strikes and had been conspicuous in such work in several cities. He was the man to whom the article in question referred; but, as said, the article pointed to plaintiff because a copy of his photograph accompanied it. This circumstance came about in a singular way according to the testimony for the defendant. The plaintiff, it seems, has been prominent in baseball circles in St. Louis for several years, and in the spring of 1902, when the baseball season was opening, one of the reporters on the defendant's newspaper, who intended to write an article about base-

ball matters, procured from the plaintiff his picture to be used in connection with that article. Defendant made a cut from the photograph and when the baseball article was published, plaintiff's picture accompanied it, and under the picture the name and title "Capt. James Farley." This happened about eighteen months before the publication af the alleged libelous article. In November, 1903, there was a street railway strike in the city of Chicago and James Farley, the strike breaker, was employed by the street railway companies in that city to assist in moving cars against the opposition of the strikers. The article in question was written in the defendant's office for publication in its paper, the St. Louis Chronicle. There is a department in the newspaper office designated as "The Morgue" in which are kept cuts and pictures to be used in connection with articles published in the paper. The editor of the paper saw in "The Morgue" the cut of the plaintiff's picture labeled "Capt. James Farley," which had been used to illustrate the baseball article. The editor neither knew the plaintiff nor knew of him, and as the strike breaker James Farley was well known in newspaper circles, took it for granted the cut represented the latter individual and had it printed in connection with the article on the Chicago strike. The petition alleges that the picture was published along with the article for the purpose of charging that plaintiff was engaged in a fight against the laboring people and their organizations in St. Louis and other cities.

The answer of the defendant admitted the publication of the article in question, but denied that it referred to plaintiff and alleged that it referred to the James Farley who is a professional strike breaker, and not a resident of St. Louis. It stated the facts concerning the publication of the picture substantially as stated above, and averred that on defendant's attention being called to the mistake, it caused to be published in its newspaper, November 17, 1903, the following article:

Farley v. Publishing Co.

"SIMILARITY OF PICTURES.

"The other day in the publication of an item concerning Boss James Farley, the Chicago strike breaker, a picture published accompanying the article bore a striking resemblance to Mr. James Farley, deputy recorder of deeds of St. Louis. This fact has caused Recorder Farley's friends to joke him about the striking resemblance he bears to the Chicago strike-breaker. The picture printed was intended for the strike-breaker and not for the deputy recorder."

A replication was filed which put in issue the allegations of the answer. A few days after the article in question was published, an attorney, acting for the plaintiff wrote the defendant regarding the article; whereupon the defendant addressed to plaintiff the following letter:

"Mr. James Farley,

"Care Recorder of Deeds Office,

"St. Louis, Mo.

"Dear Sir:

"The receipt of a letter from Lawyer Walsh this morning causes me to write to you. I was greatly surprised that because we printed a picture of Boss James Farley, the Chicago strike-breaker, which resembles you, that you should feel it necessary to call in a lawyer. The picture was intended for Boss Farley and for no one else, and as such was printed in good faith.

"In order to have some ammunition to shoot back at your joking friends, I have caused to be printed in today's Chronicle a statement, a copy of which I enclose.

"Very truly,

"(Signed)    JOHN M. HERTEL, Editor."

There was evidence tending to prove plaintiff was humiliated by the article and subjected to some ridicule and annoyance on the part of his friends and to contemptuous treatment by other people.

At the conclusion of the evidence a peremptory instruction for a verdict for the defendant was denied. The court gave this instruction for the plaintiff:

"The court instructs the jury that if they believe from the evidence that the article with the portrait published by the defendant did mean and refer to the plaintiff, James Farley, and that the said article and portrait were generally accepted and believed to be the said James Farley, the plaintiff, by the community generally, and that the article was untrue, and was libelous, as defined in another instruction given, then your verdict must be for the plaintiff, and you will assess his damages at such sum as you believe from the evidence will fairly compensate him for any injury as shown by the evidence he has sustained by the publication, taking into consideration the extent of the circulation of defendant's newspaper at the time of the publication, the general character of the publication, and its probable effect, if any, on the reputation of plaintiff in this community at and prior to November 12, 1903, as shown by the evidence; the mortification, if any, to his feelings which plaintiff may have suffered by the publication, and the distress of mind, if any, he has suffered on account thereof; and considering all these matters, you may assess his damages at such sum as in your opinion will fairly compensate him for the injury, if any, he has suffered from the publication.

"A libel is the malicious defamation of a person made public by any printing or writing which tends to provoke him to wrath or expose him to public hatred, contempt or ridicule, or deprive him of the benefits of public confidence and social intercourse. By malice is not meant necessarily spite or ill-will, but is also meant the doing of a wrongful act intentionally without just cause or excuse; and if the jury believe the article complained of was published of and concerning plaintiff and was not true and was a libel on plaintiff, then the law presumes it was published maliciously."

The following instructions were given in behalf of the defendant:

"The court instructs the jury that if the article was not intended by defendant to apply to the plaintiff, but to some person other than the plaintiff, they will find for the defendant.

"Unless the jury believe from the evidence that the article complained of, not the picture, was published of and concerning the plaintiff, they will find a verdict for the defendant."

The instructions authorized no more than compensative damages. The jury returned a verdict in favor of the plaintiff for $400. After a motion for a new trial had been overruled, the defendant appealed.

GOODE, J. (after stating the facts).—The statement of what a libel is, contained in the instructions of the trial court, was accurate as far as it went and sufficiently broad for the purpose of this case. [Nelson v. Margrave, 10 Mo. 648; McGinnis v. Knapp, 109 Mo. 131, 18 S. W. 1134.] Whether the article in question was a libel within the meaning of the word as defined by the court, was left to the jury; and it is of this ruling rather than the definition itself, that complaint is made. The defendant's counsel insists nothing in the article was libelous—that 'it charged the Farley mentioned with doing only lawful and commendable acts; that is, assisting to move street cars for the convenience of the public against the opposition of striking crews who would obstruct transit. If this were the sum of the article, we would accept counsel's proposition. Under our laws regulating the rights of employers and employees, it could not be held libelous to charge a person with aiding to carry on any lawful business which had been interrupted by a strike of the operatives depended on to keep it going. But the learned counsel leaves out of sight other portions of the article which are clearly libelous in themselves and without the use of innuendoes

to explain their meaning. The defendant was charged with being a foe of labor organizations, and this would tend to expose him to hatred and contempt among a goodly number of his fellow citizens, thus proving detrimental to his reputation and perhaps to his pecuniary welfare. There is an important difference between saying a person assisted an employer when the regular employees were on a strike—assisted in breaking a strike—and charging that he is a foe of organized labor. That statement, however, is not the most serious part of the article; and were there nothing more, we might think it qualified by a context tending to show the meaning was that plaintiff was a foe to labor organizations only in the sense that he contended against them when they unlawfully obstructed business. Taken in that sense the statement would not be libelous. But the person referred to was accused of having accepted money from a labor organization in the city of Cleveland, on an agreement to leave the city during a strike, and of having gone outside of the corporate limits and immediately returned. That was dishonest conduct, and to accuse one of it would certainly tend to arouse the contempt of all classes of society. No innuendo was needed to expound the meaning of the charge; for its libelous character and damaging influence are apparent.

The contention is preferred that none of the statements in the article is actionable *per se,* because none of them imputes a crime, or affects the person referred to in his occupation, or falls within any of the classes of actionable words. Therefore, it is argued that as no special damage was proved, plaintiff failed to make good his case. This argument would have merit if the action were for slander instead of libel. By statutes and decisions the law has affixed an actionable quality to certain spoken words and denied it to others. That is to say, unless the words complained of as slanderous fall within one of the classes which are made actionable in themselves, a plaintiff must prove he sustained

some special damage from the utterance; whereas, if they were actionable, damage would be presumed from the proof that they were spoken and false. We do not need to be exhaustive in enumerating what spoken words are actionable *per se.* It is enough to say, in a general way, that they are such as impute to the person mentioned the commission of a crime, or that he is affected with a contagious disorder which would render him obnoxious to society, or words tending to injure his business. But written or printed matter which is communicated to third persons, stands on a different footing and is often actionable when it would not be if spoken. As intimated, if it is of a character conducive to blacken the reputation of the person referred to, or excite ridicule or wrath against him, or destroy public confidence in him, it is actionable without proof of special damage. The reason assigned for this legal difference between written and spoken language is that writing or printing injurious statements about a person, implies a deliberate purpose to do harm; whereas, detrimental words are often spoken thoughtlessly or in a passion. Weight is allowed also, to the more enduring character and wider vogue of published statements. Odgers, Libel & Slander (4 Ed.), p. 4.

The point in the present case which calls for discussion is not the libelous character of the published article, but whether it referred to the plaintiff in such sense that the defendant is answerable in damages to him. It is contended that the article meant, not James Farley, the plaintiff, but a different individual of that name, not a resident of St. Louis, who was connected with the Chicago street railway strike in 1903, and with various other street railway strikes at other times and in other cities, and whom all the circumstances pointed to as the person intended, to the exclusion of the plaintiff; wherefore, it is said to be apparent that, libelous or not, the article was no libel of the plaintiff and he

should have been denied a verdict. It will be observed that the court below left it to the jury to say whether the article and the picture published with it, referred to the plaintiff and were generally accepted and believed to mean the plaintiff by the community. If the jury found those questions in the affirmative, and that the article was libelous, they were directed to return a verdict in plaintiff's favor. The theory of defense at this point opens into a field of controversy as to how far the intention of the publisher of an alleged libel to injure the particular plaintiff, is material to the latter's recovery, if in fact, the publication was false and defamatory. This inquiry extends into a wider field, and one fruitful in judicial disagreements, regarding the necessity and influence of malice as an element of libel. The cases present subtle and elusive phases of reasoning on this subject and are so conflicting that the law of libel has been denounced as vague, fluctuating and incomprehensible. (Holt, Libel, Preface; Ency. Britt. "Libel.") Likely its uncertainty is due to the retention by the courts of the doctrine that malice is essential to a libel more than to any other tort. The word "malice" has been declared by an eminent jurist rarely to have any meaning in law except a misleading one (Justice Stephen as quoted in Newell, Slander & Libel (2 Ed.), p. 317.) Another judge has deplored the use of the word and the maintenance of the doctrine that malice is essential in cases like this (Lord Bromwell in Abrath v. R. R., 11 App. Cas. 253) because malice, though always insisted on in theory, is dispensed with in every comprehensible sense. Only legal malice is exacted and, on analysis, this sinks into a myth or fiction; for so much malice as is necessary to afford compensation for actual damage is inferred from the fact that a false writing was published concerning the plaintiff; although, in truth, the publisher felt no ill-will and believed he was telling the truth. This result eliminates malice from actions for libel, as a practical factor, save

as a reason for awarding more than compensative damages or overcoming the defense of privileged communication. A libel is a tort, and, generally speaking, neither the intention with which a tortfeasor acted nor the state of his feelings toward the person injured or mankind at large, lessens his responsibility for injuries actually caused by his wrongful act. He must make recompense, although he was free from moral delinquency. Any false and defamatory publication which is not privileged gives rise to a case for damages sustained from it. This is true of libel, notwithstanding the formula so often reiterated, that malice is the gist of the action. The essential facts are, the falsity of the charge, its publication and libelous nature. If true, no degree of malice in the publisher will make it libel, nor, if false, will rectitude of purpose exonerate him.

In Jones v. Murray, 167 Mo. 25, 49, 66 S. W. 981, our Supreme Court said the sum of the law is that if the publication was false and the plaintiff has suffered actual damages, he is entitled to recover such damages, no matter how innocently, or with what purpose, intent or motive the defentant acted. But if the defendant acted in good faith and without malice, that fact would mitigate the damages. The same propositions were announced in the thoroughly considered case of Root v. King, 7 Cow. (N. Y.) 613, 633. The courts have said frequently that the law looks at the tendency and consequence of the publication, not at the intention of the publisher; and that the absence of malicious intent will not avail the defendant as an excuse. [Haire v. Wilson, 9 B. & C. 643; Fisher v. Clement, 10 B. & C. 472; Wenman v. Ash, 13 C. B. 845; Huntley v. Ward, 6 C. B. n. s. 514.] And so the standard text-writers say. [Odgers, Libel and Slander (4 Ed.), 319; Newell, Slander and Libel (2 Ed.), 901.] What is meant by malice in these actions is that the publication of the false matter was without lawful excuse; or, to present the rule in a perfectly definite and intelligible form,

that it was unprivileged.   If it was a privileged com-
munication, no malice is inferred from the publication
and the case fails unless malice is otherwise proved.   In
this case the article was not of a privileged sort and the
publication of it will sustain the inference of malice
against the plaintiff, though the defendant acted under
a total misapprehension about the facts and believed it
was publishing the simple truth.   Defendant mistakenly
identified the plaintiff, of whom the published facts
were not true, with another individual of the same name
of whom they were true, and under the mistaken impres-
sion published plaintiff's picture labeled "Boss James
Farley," thereby referring directly to plaintiff.   But the
article was false and libelous as regards plaintiff, was
published without lawful excuse, not being privileged,
and therefore in the artificial and meaningless termin-
ology of the law, was malicious.   It is certain that the
article in question and the picture of the plaintiff which
accompanied it, labeled "Boss James Farley," pointed
to the plaintiff as the person meant by the writer, and
that plaintiff would be taken as the person meant by
those citizens of his home community who knew him well
enough to recognize the picture, but not well enough to
know he was innocent of the acts ascribed to him.   In-
timate friends and familiar acquaintances probably
knew the paper had made a mistake in designating
plaintiff as the strike-breaker, James Farley; but even
they might have thought that for some reason the paper
had chosen to represent him as that character.   But
every one who knew something of him, without knowing
who was in truth, the strike-breaker, was apt to take for
granted that plaintiff was; and, of course, such an im-
pression on their minds would be detrimental to the
plaintiff's reputation, as the sketch accused the subject
of it of dishonorable conduct.   If we scrutinize yet more
closely the publication of the article and the picture,
the conclusion cannot be escaped that the defendant's
editor intended readers of his paper to understand that

the person whose picture was published was the person to whom the article alluded. In that sense the article meant and referred to this plaintiff and he was intended to be described by the writer. It is true, this intention may have been brought about in a curious way, by the mistake of the editor as to whom the picture in his "Morgue" represented. He said he thought it was a picture of James Farley the strike-breaker; not knowing there was such a person as the plaintiff in existence. Now the publication of the article and the picture wrought damage to the plaintiff—of this there was positive proof, and none to the contrary. Laboring men who were acquainted with him made taunting remarks and gestures and said he was a "scab;" his children were pointed out and jeered at; and he was scorned by members of his community not familiar with his life. Should he be denied redress for his distress and the injury to his reputation, because the defendant's editor mistook his picture for that of another man? We hold not. It is sufficient for the plaintiff's case that the article meant and referred to him and was so understood by the community generally on reasonable grounds. The jury was fully justified in finding that the article referred to the plaintiff, as his picture accompanied it and he was designated as "Boss James Farley," about whom the statements in the article were made. Moreover, the published retraction was disingenuous and tended but little, if at all, to disabuse the minds of the community. In the supposed retraction the defendant did not frankly admit that it had published plaintiff's picture for that of the strike-breaker Farley, by mistake; but said the published picture bore a striking resemblance to plaintiff and was intended as the picture of the Chicago man. The article said the picture had caused plaintiff's friends to joke him about his resemblance to the strike-breaker. It is obvious that as the picture was of the plaintiff, such an explanation was vague and not well adapted to remove the belief that plaintiff was the

person accused in the libel. The mistake of the editor might be considered in mitigation of damages; but for the damage actually inflicted on plaintiff's feelings and reputation he ought to have redress, and it is no excuse to say a mistake occurred. This would be much like holding that a man who honestly believed he was undermining his own land but was actually undermining the land of his neighbor, should be excused from answering for damage done to his neighbor because he mistook the boundary line between the properties.

The deepest doubt we have had in this case is as to whether the defendant is liable, in any event, for injury done by mistake, or only if it failed of ordinary care; that is as to whether it was entitled, under the instructions, to a finding on the question of its exercise of reasonable care in publishing the picture. This question need not be decided; because the defendant's requested instructions called for a verdict in its favor, not on a finding that it used ordinary care to learn whose picture it was about to publish, but merely on a finding that the picture was intended to represent some one else than plaintiff. This is not the law. It could and did represent no one but the plaintiff and defendant was responsible for putting plaintiff in a false light; at least, unless it did everything that, in reason, it ought to have done to prevent the mistake.

In Davis v. Marxhausen, 86 Mich. 281, a newspaper in Detroit had published that Michael Davis, residing at 311 East Columbia street, had been arrested for theft. A man by that name had been arrested for theft, but he was a different person from the Michael Davis who lived at the number stated. The latter instituted an action for libel and lost his suit in the lower court on an instruction that he must prove he was the person designated in the publication. It was held on the appeal that, as his name and residence were both given, he was so precisely designated that there was no question of the kind to be submitted; that the libel consisted in refer-

Farley v. Publishing Co.

ring to him as the person arrested, when in truth he was not. Now, this plaintiff's name was given and his own picture published with the article; not the picture of the strike-breaker. Plaintiff, therefore, was designated as the one written about. This case seems to be identical in principle with the Michigan one; and as the mistake in that instance was held no defense, the decision is a pertinent authority. Of course, the mere use in the article of the name which belonged to the plaintiff, if it also belonged to some one else whom the article meant, would give the plaintiff no cause of action for libel if nothing was said or done to point him out as the individual meant. But his name was used and given application by printing his picture labeled "Boss James Farley." The identity of the person accused by the article was unmistakable. We are the more inclined to adopt this ruling because in this State, although malice, technical or actual, is said to be an ingredient of a libel, and, indeed, the gist of it, the Supreme Court has decided that if a libelous article is falsely published, the law will affix malice to the publication. [Buckley v. Knapp, 48 Mo. 152, 161.] That was a libel case in which the opinion said that in most instances of injury against the person or property of another, the actual intention of the author is immaterial; that the law considers any one whose carelessness and want of due regard to the rights of others occasions injury to them, is as much bound to make reparation as one who willfully does mischief. The reason assigned for the rule is that it makes no difference to the injured party whether his injury was occasioned by a willful or negligent act, and such consideration ought not to affect his remedy. That view seems to harmonize the doctrine of the law of libel with that of other torts, as regards the effect of the intention of the wrongdoer on his responsibility for damage actually inflicted. If the intention to injure will not make the publication of a true writing actionable, neither should the lack of

such intention take away a right of action for the publication of an untrue writing.

Decisions of a contrary import can be found. In Hanson v. Globe Newspaper Co., 159 Mass. 293, it was held by an eminent tribunal that where a mistake occurred in the name of a party accused in a newspaper of having been arrested for a crime, he was not libeled. That ruling was sanctioned by a bare majority of the judges and there was a vigorous dissenting opinion which is approved in the note in 20 L. R. A. 856, and seems to us more in harmony with the law generally and especially as expounded by the Supreme Court of this State. We have found no decision outside its jurisdiction which gives the majority opinion much countenance, but there is another Massachusetts case somewhat analogous. [Smith v. Ashley, 11 Met. 367.]

It is said in numerous cases that the plaintiff must prove the libel or slander was uttered of him. [Baldwin v. Hildreth, 14 Gray 221.] We think this fact was proved in the present case in the sense the rule means, namely; that the article referred to the plaintiff. It was not necessary to show he would have been referred to had the editor understood all the facts. The proposition is maintained generally that though the publication of a libel was due to mistake, the publisher is answerable; and we see no reason why libelling a person on account of mistakenly identifying him with some one else should be an exception. That publication of a libel by mistake is no defense to an action for the damages caused, was held, under various circumstances, in the following decisions: Shepheard v. Whitaker, L. R. 10 C. P. 502; Fox v. Broedrick, 14 Irish L. R. 453; Blake v. Stevens, 4 F. & F. 232; Loibl v. Breedenbach, 78 Wis. 49. In the first of those cases the facts disclosed were that the name of the plaintiff's firm was published by mistake in defendant's newspaper under the heading "First Meeting Under the Bankruptcy Act," when it was intended to be published under the heading "Dis-

solutions of Partnerships." A verdict for the plaintiff was sustained on the ground that the public could have understood from the publication that plaintiff's firm was bankrupt. On the whole, our opinion is that the contention that plaintiff was entitled to no verdict or to nominal damages only, because the defendant was free from malice and had no intention to libel him is without merit. We think he was entitled to compensation and that the evidence authorized the damages assessed.

The judgment is affirmed. All concur.