## JONES, Appellant, v. MURRAY.

### Division One, February 19, 1902.

1. **Libel:** MALICE: DEFENSES. A publication, libelous per se, implies malice. In such case the absence of malicious intent is not a complete defense; it is admissible only in mitigation of damages.

2. ———: FALSE PUBLICATION: RECOVERY: MITIGATION. If a publication, libelous per se, is false and the plaintiff has suffered actual damages, he is entitled to recover such damages; however innocently or with whatever motive the publication was made. But if defendant acted in good faith and without malice, that fact mitigates his punishment and diminishes the exemplary damages plaintiff is entitled to recover. Evidence in mitigation can not affect the actual damages sustained, and the court should so caution the jury.

3. ———: ———: ———: ———: HEARSAY: COURT'S CAUTION: INSTRUCTION. The jury should be clearly instructed that mitigation must not be taken as a defense or as lessening the actual damages, but can be considered only in reduction of the punitive damages. And where mitigation rests upon hearsay, that is, that some one told the defendant the facts printed and he believed them and published them in good faith, it is imperatively necessary to instruct the jury as to the nature, extent and effect of a plea in mitigation.

Appeal from Greene Circuit Court.—*Hon. C. B. McAfee,* Judge.

REVERSED AND REMANDED.

*Charles J. Wright* and *A. D. Bennett* for appellant.

(1) The general denial admits the falsity of the publication. Sheahan v. Collins, 20 Ill. 330; Townshend on Slander and Libel, sec. 403. (2) In a plea of mitigation nothing

should be alleged that tends to justify or show that the publication is true. Regmer v. Cabot, 2 Gilm. 140; Sheahan v. Collins, 20 Ill. 326; Newell on Def., Sl. and Lib., 898; Storey v. Early, 86 Ill. 461. (3) The matters pleaded do not tend to show that no crime was committed, but the contrary, and send no antidote with the poison. The facts pleaded give additional strength to the libel. Hall v. Adkins, 59 Mo. 148; Wood v. Hilbish, 23 Mo. App. 401; Trimble v. Foster, 87 Mo. 49; Morgan v. Rice, 35 Mo. App. 591. (4) Malice is implied. Defendant had no mistaken view of the law, but published the article regardless of plaintiff's rights. Arnold v. Sayings Co., 76 Mo. App. 159; Hall v. Adkins, 59 Mo. 144; McGinnis v. Knapp, 109 Mo. 131; Callahan v. Ingram, 122 Mo. 355. (5) Only such mitigating circumstances as were within defendant's knowledge when he published the article can be pleaded. Morey v. Association, 123 N. Y. 211; 13 Am. and Eng. Ency. Law, p. 441. Plaintiff's general character only is in issue, whereas defendant pleads that plaintiff's reputation and character is not good. Newell on Def., etc., 893. (6) The alleged facts as pleaded having been made known to Geddes, and then by Geddes to defendant, are hearsay, and are not proper matters to be pleaded or proven. Morey v. Association, 123 N. Y. 209; Anthony v. Stephens, 1 Mo. 254. (7) Rumors and current reports are not competent to be pleaded or proven. Arnold v. Sayings Co., 76 Mo. App. 182; Addison on Torts, sec. 1166; Baldwin v. Boulware, 79 Mo. App. 11. (8) Neither defendant's nor Geddes' belief can be pleaded or proven. (9) Defendant must plead mitigatory facts if he would introduce evidence thereof. The statute does not make any matters mitigation that were not so before the statute. R. S. 1899, sec. 636. (10) Nothing can be pleaded in justification under the guise of mitigation. The object of the pleader was to justify without pleading justification, which the law forbids. Coe v. Griggs, 76 Mo. 621. (11) Defendant can not plead in mitigation or otherwise that plaintiff was generally sus-

pected of the crime with which he was charged. Newell on Def., Slander and Libel, p. 899; Cole v. Perry, 8 Con. (N. Y.), 214; Newell on Def., etc., 890. (12) Motive only applies to exemplary damages. Callahan v. Ingram, 122 Mo. 370; Lewis v. Humphries, 64 Mo. App. 466. (13) All the things pleaded in mitigation were not sufficient to justify a reasonable man in believing plaintiff guilty. (14) There is no evidence to sustain the verdict; because it shows (a) Defendant never heard the alleged facts included in answer. (b) Shows malice on part of defendant. (c) Plaintiff's general character good. (d) Burns testified he did not know general reputation of plaintiff. (e) Burns did not tell Geddes that Jones had a bad reputation, and that plaintiff was uncle to the Sprague children. Because it does not show that (a) Plaintiff was drinking heavily at Nixa. (b) Plaintiff and Carroll were not seen at the thresher from Wednesday afternoon, Sept. 14, until Friday morning, Sept. 16, and quit work that day. (c) Peyton Kelly knew the reputation of plaintiff was not good. (d) Kelly became suspicious of plaintiff and Carroll. (e) Bennett prompted plaintiff to sue. (15) Incompetent, immaterial and irrelevant testimony was admitted in behalf of defendant over objection of plaintiff. All the testimony about the killing of Duffner; The fact of one of Duffner's girls being afterwards killed; Seeking to identify plaintiff as one of the parties who killed Duffner; The sack and cups; The introduction of the cups; What Burns heard and saw; What Burns said about a grip, clothing and finding blood; Defendant's saying he had no ill will; Burns' talk with Wear, Kelly and Green; Burns' belief as to being on the right track. (16) The remarks of both attorneys for defendant charging plaintiff with the murder constitute a gross abuse of the privilege of argument. Evans v. Trenton, 112 Mo. 405. (17) The charge against plaintiff is libelous per se. Townshend on Libel and Slander, sec. 168; Odgers on Libel and Slander, 65, 121; Anthony v. Stephens, 1 Mo. 254·

Noeninger v. Vogt, 88 Mo. 589; Johnson v. St. Louis Dispatch Co., 65 Mo. 539.

*T. H. McGregor* and *T. J. Delaney* for respondent.

(1)   The motion of plaintiff to strike out the answer of defendant was properly overruled.   (a) The general denial and the special plea in mitigation are not inconsistent.   The general denial not only put in issue the publication (which stands admitted by the special plea) but also put in issue the allegation of express malice as a basis for punitive damages and also put in issue the claim of plaintiff to compensatory damage.   The fact that such plea also put in issue the publication does not render it inconsistent, either on principle or on authority, with the plea of mitigation.   Indeed, the matters pleaded in the special plea are admissible in evidence under the general denial.   Sparling v. Conway, 75 Mo. 510; Steinecke v. Marx, 10 Mo. App. 580; Weaver v. Hendrick, 30 Mo. 530; Rhine v. Montgomery, 50 Mo. 566; Anthony v. Stephens, 1 Mo. 254; Hawkins v. Globe Printing Co., 10 Mo. App. 174; Wood v. Hilbish, 23 Mo. App. 389; Jones v. Townsend, 21 Fla. 431; Stees v. Kemble, 27 Pa. St. 112; Bisbey v. Shaw, 12 N. Y. 67; Warren v. Lockerby, 31 Minn. 431.   (b) In an action of slander or libel, the facts and circumstances which induced the defendant to believe the charge true at the time he made it may be pleaded in mitigation of damages although they may tend to prove the truth of the charge.   They must, however, be pleaded in mitigation, as was done in this case, and not in justification.   Hall v. Adkins, 59 Mo. 144; Wood v. Hilbish, supra; Trimble v. Foster, 87 Mo. 49; Morgan v. Rice, 35 Mo. App. 591; Callahan v. Ingram, 122 Mo. 355; Coe v. Briggs, 76 Mo. 619; Dolevin v. Wilder, 34 How. Pr. (N. Y.) 490; Bush v. Prosser, 11 N. Y. 347; Bisby v. Shaw, supra; Manning v. Clement, 7 Bing. 362; Husen v. Dale, 19 Mich. 17; Wilson v. Fitch, 41

Cal. 364.    (2) . The doctrine that unless the facts pleaded send "an antidote with the poison," "they give an additional strength to the libel," has no application to the case in bar. If the facts stated at the time and in connection with the charge show that no crime was committed, the antidote goes with the poison and is a complete justification.    If the facts stated show that the charge does constitute or amount to a crime, such facts will not constitute justification.    But it is nowhere held that such facts can not be pleaded in mitigation.    Hall v. Adkins, 59 Mo. 148; Wood v. Hilbish, 23 Mo. App. 401; Trimble v. Foster, supra; Morgan v. Rice, supra; Arnold v. Sayings Co., 76 Mo. App. 159; McGinnis v. Knapp, 109 Mo. 131; Callahan v. Ingram, supra; Coe v. Griggs, supra.    (3)    If plaintiff objected to parts of defendant's special plea as constituting an insufficient plea in mitigation, he should have moved to strike out such objectionable parts, if any, and not moved to strike out the whole answer.    The motion to strike out the whole answer is in effect a demurrer and was properly overruled because the facts stated therein constitute a good plea in mitigation, even if the special allegations above mentioned should have been struck out.    Isaacs v. Skrainka, 13 Mo. App. 593; Austin v. Loring, 63 Mo. 19.    (4) General rumors, or a general suspicion that the party is guilty of the acts imputed may be given in evidence in mitigation of damages.    13 Am. and Eng. Ency. Law, p. 440, and cases cited. A *fortiori,* the fact that one is under arrest charged with a crime and the facts upon which the officers of the law acted in making such arrest must, on principle, be admissible in mitigation, either on the theory to negative the existence of express malice or to show that the character of complainant is also traduced.    Nelson v. Wallace, 48 Mo. App. 193.    (5) The evidence in this case shows a qualified privilege on the part of the defendant, and although the court struck out defendant's answer to that effect, defendant was entitled to a verdict as the plaintiff failed to prove express malice.    Sulli-

van v. Commission Co., 152 Mo. 269; Finley v. Steele, 159 Mo. 299. (6) The plaintiff asked and the court gave the following instruction: "You are the judges of the weight to be given to the testimony of the witnesses and of the facts, but under the Constitution and law of Missouri, you are also the judges of whether or not the alleged libelous article was in fact libelous." This remitted the whole question to the jury, and having asked such an instruction, plaintiff can not complain because the jury found as a matter of law and fact that he was not libeled and was not damaged. State v. Armstrong, 106 Mo. 395; Mitchell v. Bradstreet, 116 Mo. 226.

MARSHALL, J.—This is an action for five thousand dollars damages, for a libel of the plaintiff published in the Springfield Republican, on September 22, 1898. The defendant is and was the owner of the paper. The libel is as follows:

### A MURDERER CAPTURED.

*Officer Foster Burns Arrested Charles Carroll for Duffner Tragedy—He is a Cousin of the Notorious Jones Boys—George Jones Implicated—He is Robber No. Three who Killed the Farmer—He Has Skipped the Country.*

One of the murderers of Charles Duffner, the Dallas county farmer, is confined in the Greene county jail. The arrest was made at 11 o'clock Tuesday night by Deputy Constable Foster Burns and Constable George Greene at the Farmers' Home, a boarding house on North Campbell street. There is little doubt but Officer Burns has placed behind the bars one of the daring robbers and will capture the other robber. The man now in jail is named Charles Carroll, son of Henry Carroll, who lives three miles south of Buffalo and about eight miles from the Duffner home. Ever since the murder of Mr. Duffner last Thursday Officer Burns has been on the lookout for the culprits, and Monday his vigilance was rewarded by hearing that two Dallas county boys had been boarding at the "Farmers' Home." They gave their names as George Jones and Charles Carroll. The officer ascertained that they arrived in the city the first of September and two days later left the boarding house, telling the proprietor

that they were going to work in the Gulf shops and would board on the south side, but they told several people they were going to Christian county, and also stated they were going to Galena, Kansas. Nothing was heard of the men until Monday, September 12, when they were seen by Mr. Williams, proprietor of the Farmers' Home boarding house, who saw them going east on Commercial street. Next heard of the men was last Saturday night, when they returned to the Farmers' Home with their clothing in a muddy condition. Carroll's shirt was badly torn and had blood on the front. They took a room and changed their clothing. Both Carroll and Jones were in a state of anxiety and very nervous. Sunday morning Jones left the boarding house, stating he was going home, and Carroll remained. Officer Burns learned that the two men had been stopping at Mr. Williams's place. He was acquainted with them, having been raised in that section of Dallas county and his suspicions were aroused that they might be implicated in the Duffner tragedy, and after a thorough investigation he became convinced that they were implicated in the murder, and Tuesday night placed Carroll under arrest. George Jones is a son of Sam Jones, and a brother of the notorious Jim Jones, who killed the Texas sheriff and his deputy and is believed to have been implicated in the Duffner affair. Carroll is a cousin of the Jones boys. Deputy Constable Burns found a valise at the boarding house which contained three shirts, two pair of pants, a pair of shoes and stale bread. The shirts had blood on them and were taken to Prosecuting Attorney Wear's office, where that gentleman heard the story and stated he believed Carroll was one of the robbers and advised that Otto Duffner, a son of Charles Duffner, be notified to come to Springfield and identify the prisoner. The officers are satisfied that Carroll is the man whom Otto Duffner held while his father struggled with the robber on whom he succeeded in inflicting fatal wounds. When Carroll was placed under arrest by Officer Burns he became very much agitated and acted like a guilty person. Mr. Burns was raised in the neighborhood of the Joneses and Carrolls, and was well acquainted with the family. Charles Carroll is about 25 years of age. He said he was innocent of the crime for which he was arrested and would be able to prove an alibi. While he was told he would be taken to Dallas county he became very pale and said he did not want to go there. Officer Burns telegraphed to Buffalo yesterday morning to the sheriff, notifying him to arrest George Jones, who is robber number three, the one who killed Duffner. The officer believes that Jones has skipped the country and had no idea of returning home. Otto Duffner is expected to arrive in the city today to identify Carroll. When the attempted robbery occurred

the robbers wore false beards, and it may be difficult for young Duffner to identify him. Although living within eight miles of each other, Carroll stated yesterday he was not acquainted with the Duffner family. The capture of Carroll, if he proves to be one of the robbers, is a neat piece of detective work and Officer Burns will receive a reward of $500 from the county and widow of Charles Duffner.

The second amended answer, upon which the case was tried is as follows:

"Now comes the defendant and for amended answer to plaintiff's petition denies each and every allegation therein contained. Wherefore he prays judgment.

"For further answer to said petition the defendant pleads the following mitigating circumstances, to-wit: That about sundown of Thursday, September 15, 1898, in the county of Dallas and State of Missouri, there was committed a most foul, bloody, cruel and cowardly murder; that at said time and place one Charles Duffner, his wife and son were assaulted by two masked robbers and one of the robbers shot at and tried to kill Miss Duffner; that after a hard struggle one of the said robbers was killed and the other was overpowered and captured; that the son of said Charles Duffner was then dispatched to arouse the neighbors and fetch the officers of the law; that thereupon a third robber appeared upon the scene and shot and killed Charles Duffner and liberated his companion in crime. The murderers then fled on horses belonging to the Duffner family to a point about two miles north of the scene of the tragedy and then killed the said horses and mounted their own animals and rode away. That on account of the masks and excitement the family were unable to fully describe the murderers, but in their flight they dropped a sack which contained some crusts of bread and three tin cups; that on said tin cups was engraved or cut the name of the Mrs. Sprague's children; that plaintiff herein is the uncle of said children. That on or about September 1, 1898, the plaintiff and one Charles Carroll, both being residents of Dallas county,

Missouri, and living about ten miles north of the scene of the tragedy, left their homes in said county and came to Springfield where they remained for some days; that during this time they boarded at a house kept by one Williams, and during said time they made contradictory statements as to where they intended going; that upon leaving Springfield they landed at Nixa on or about Saturday, September 10, 1898; they were supposed to have been next seen in Springfield on Monday, September 12th, or Tuesday, September 13th; they hired to one Jerome Bolin near Nixa and on Wednesday, September 14, 1898, they quit work at the threshing machine, and went to Nixa where they began drinking heavily; they were not seen again from Wednesday afternoon until Friday morning, September 16, when they again reported for work at the threshing machine in Christian county, but again quit work that day and started to Springfield, Missouri, where they arrived at 5 p. m. September 17, 1898; that upon arriving at Springfield they went to the Farmers' Home in Springfield and also went to the home of Peyton Kelly, a distant relative of plaintiff; that by this time the whole country was aflame in the search of the two escaped murderers and in the effort to identify the dead robber.   That Peyton Kelly knew that said plaintiff and his companion Carroll lived in Dallas county, and knew that the reputation of plaintiff and several of his brothers was not good and knew of the commission of this crime.   That said Kelly became suspicious of said parties and noticed especially their strange manner and nervousness and observed their clothes were muddy and the shirt of one of them torn and bloody; that after being at Kelly's they went to another relative, to-wit, John Hendrickson, and thereupon Peyton Kelly communicated his suspicion to George Green, constable of Campbell township, and to Foster Burns, deputy constable of said township.   That these officers then possessed themselves of all the foregoing facts; that said officer Burns also knew

the Jones family, and knew that the reputation of plaintiff was not good, and said Burns then found the valise kept by plaintiff and in the same was found some stale bread and muddy clothing and a torn shirt with blood thereon, and also on a shirt was found the imprint of the muzzle of a freshly discharged pistol; that thereupon said officers submitted all of said facts to Hon. A. H. Wear, prosecuting attorney of Greene county, who stated as his opinion that the facts justified an arrest; that thereupon said Green and Burns arrested the said Carroll on September 20, 1898, and caused the arrest of plaintiff herein either on the same day or on September 21st. That on September 21, 1898, defendant was the owner and publisher of the Springfield Republican, but had nothing to do with the gathering of the news items, leaving this to his corps of reporters; that one H. S. Geddes was then in his employ and said Geddes was a careful, discreet and prudent reporter; that said officers Green and Burns were painstaking and careful officers and said A. H. Wear was a cautious and prudent adviser; that all of said facts were made known to said H. S. Geddes, and then to defendant herein, and defendant and said Geddes believed that the real murderers had been captured; that acting upon such belief and in the interest of public justice and not out of any malice or ill-will towards either plaintiff or Carroll, defendant published said article. Defendant states as a matter of fact plaintiff's reputation and character is not good. Defendant further states that no request was ever made by plaintiff or defendant to publish a statement of his side of the case which defendant would cheerfully have done, and would cheerfully have corrected any erroneous statement of facts and would cheerfully have made any and all amends consistent with the facts submitted, but that plaintiff was on the contrary induced and prompted by A. D. Bennett, one of the counsel in this case, to institute this suit. Wherefore, defendant prays that these matters may be inquired of in mitigation of said publication."

The answer, as filed, contained a further attempted plea of privileged communication, but the court adjudged it insufficient and struck it out. The plaintiff moved separately in the same motion, to strike out the plea of mitigation, but the court overruled the motion in that particular, and the plaintiff preserved an exception, and filed a reply, which was a general denial. The defendant disqualified the regular judge of the trial court, and by agreement, a special judge was selected to try the case.

The trial devolved the facts to be substantially as follows: that the defendant owned the Springfield Republican, and that the libel was published on September 22, 1898; that the defendant never saw the libel until it appeared in his paper, but was told the substance of it by Geddes, a reporter employed by him, the day before it was published. The plaintiff offered in evidence a copy of the paper of September 23, 1898, which contained an article to the effect that Carroll was released on the day previous because Otto Duffner, after seeing him, declared that he was not one of the men who was at his father's house. The court also excluded a copy of the weekly edition of the paper containing the libel complained of. The evidence further showed that on September 15, 1898, between six and seven o'clock in the evening, two men went to Andrew Duffner's house in Dallas county. One of them attacked and shot Duffner, and the other attacked his son Otto. Duffner succeeded in killing the man that attacked him, and he and his son overpowered and captured the man that attacked the son. About that time a third man appeared on the scene, and shot and killed Duffner, shot at his son and daughter, and rescued the captured man, and they two escaped on Duffner's horses, which were found next day, some miles from the place, shot to death. The two men who made the first attack wore false beards, and Mrs. Duffner, while assisting her husband in his fight with the man that was killed, pulled his false beard off, and recognized him as one of three men who had been to their

house about ten or eleven o'clock that day and had purchased a bottle of wine, but she positively testified that the plaintiff was not one of the men that came to her house at either of the times mentioned. It further appeared that after the tragedy a satchel was found where the third man jumped over the fence, which contained some food and some cups, on which were scratched or engraved the names, "Marvin Leroy Sprague," and "Mabel Sprague," respectively, which by general reputation were shown to be the names of Mrs. Sarah Sprague's children, and it was shown by the testimony of Burns, the deputy constable, that he had heard that Mrs. Sprague is a sister of the plaintiff, and by the testimony of the sheriff of Dallas county that she is his sister, and when she was on the witness stand neither party asked her whether she was or not, so it stands proved for the purposes of this case. The court refused however to permit Mrs. Sprague to testify that the cups so found were not and never were the cups of her children. The only attempt made to prove that the plaintiff's character was bad, was by the testimony of W. H. Ruth, the sheriff of Dallas county, and this attempt failed, for instead of his testimony showing such bad character, the sheriff said he never heard anything about his character "more than he gets drunk once in a while."

Burns, the deputy constable, living in Greene county, who was acting as a detective in the matter in hopes of earning the five hundred dollars reward that the county of Dallas and the family had offered, testified as follows:

"Q. Just go ahead and tell as an officer what you learned as an officer and what you found on investigation that led you to make the arrest of Mr. Carroll. Did you telegraph to have Jones arrested? A. After Carroll's arrest I consulted the prosecuting attorney.

"Q. You telegraphed to have him arrested? A. Yes.

"Q. Go ahead and tell all you learned and all you saw and heard as an officer that led you to make the arrest of Car-

roll and to telegraph the arrest of Jones.   Tell it in your own way and all the facts and circumstances?

"Objected to as irrelevant, incompetent and immaterial. Objection overruled.   Plaintiff excepted.

"A.   It was the next day, or possibly might have been two days, after the murder.   I was informed by some one from Dallas county, that Jones and Carroll had been up here; that they had come by Mr. Duffner's about a week or such a matter prior to the murder, and I afterwards found out that they had been at Nixa, and also found out they had stopped over here at Mr. Williams's, the boarding house in north town, and had made contradictory statements as to where they were going. One man told Mr. Stewart that they were going to Galena, Kansas, and that evening about four or five o'clock George Green and I were at Judge Ferguson's office, and Peyton Kelly, mail carrier, a cousin of these boys, came along, and we talked with him about the matter and he said, 'Yes, they had been to his house?'   They came in I think, Saturday evening. He said 'from Nixa.'   He said they told him they had been down to Nixa, Christian county.   He went on to tell us about it after we had talked with him quite a good while and of course he didn't want to tell anything on the boys because they were relatives of his, I suppose, but he told about their muddy clothing, and about one of them having blood on his shirt.

"Q.   Did he tell about their actions?   A.   I don't remember which one of them it was he said had blood on his shirt.

"Q.   Did he tell about their actions?   A.   They acted very nervous, one of them at least.   I don't remember which one it was.   May have been Charley or may be George.

"Q.   Then where did you learn they had gone?   A.   I found George had gone back home to Dallas county and that night Green arrested Charlie at Williams's house going in there that night.   The next morning we went there and found

Jones v. Murray.

a grip and in it some working clothes. I didn't find anything else with exception of some old dried up bread, looked like a piece of light bread.

"Q. Did you find the shirt? A. Yes.

"Q. Torn? A. Yes, it was torn in the side.

"Q. Did Carroll make any statement about how the blood come there.

"Objected to. Question withdrawn.

"Q. Did you or any one find anything else on that shirt? A. I brought the grip of clothing to Mr. Wear's office. He first discovered that place in the sleeve of shirt that looked like where a man had taken the end of a pistol barrel and put it against his sleeve and turned it around. You could see the print of the powder mark or it looked like it, it might have been something else.

"Q. You judged at that time it was the muzzle of a pistol? A. I wouldn't swear it was, but it looked that way.

"Q. State what explanation was made at that time about how the blood come on the shirt?

"Objected to as incompetent and immaterial.

"The Court: Gentlemen of the jury: No part of this testimony is intended to show guilt upon the part of this plaintiff, or to show any discrepancy in his statement, but the purpose and object of it is to mitigate the offense of publishing about a man that which was not true, and the law permits such mitigation by showing the circumstances surrounding it, and the reason why it was done, to show the absence of any express malice upon the part of the defendant, and it is admitted for no other purpose.

"Q. Tell what statement he made about how the shirt became bloody; first, did he say it was his shirt, Jones'? A. I don't remember that.

"Q. What is your best recollection as to whose shirt he said it was. A. I will tell if you will let me. He said that at Nixa, he and George were on a little drunk that day,

and he thought George got his shirt bloody while he was drunk perhaps. That George got his nose bleeding while he was drunk at Nixa. That is what Charlie told me.

"Q. You say you submitted these facts to Mr. Wear, the prosecuting attorney; at that time did you know' or think you knew the reputation of these men in Dallas county? A. No, sir; I knew George when we were little boys.

"Q. From the facts you were possessed of did you make the arrest? A. Yes.

"Q. And after having the talk with Wear? A. Yes, I thought that I had plenty of evidence to warrant the arrest.

"Q. You wouldn't have arrested them if you hadn't believed you were on the right track. A. I hardly would. I had nothing against the boys.

"Q. Did you learn all the facts before the article was published on the twenty-second of the following week? A. I had heard all about that shirt business and the powder business.

"Q. And the tin cups? A. I heard about that before I arrested Charley.

"Q. What had you heard about the tin cups? A. I don't know; only what different parties would tell me from down there.

"Q. You had heard that there had been cups left on the ground with the names of the Sprague children on them? A. Yes, I knew them.

"Q. Didn't you know Mrs. Sprague was his sister? A. I didn't know it as a fact, but I had heard it possibly sometime before.

"Q. Did you tell H. S. Geddes all of these facts when you were relating it? A. Yes, sir. He asked me all about it.

"Q. You disclosed to him all you knew? A. All that I remembered of knowing. Geddes was a reporter on the Republican.

"Q. Wasn't there pretty general talk all around town when the facts became known that Jones and Carroll were the ones implicated, and wasn't that before the article appeared? The article appeared on the twenty-second and your arrest was on the twentieth? A. I can't remember that.

"Q. You can't remember whether it was talked of or not? A. Oh, I know of course, there was lots of talk, like any other arrest. There are always some people who will believe it and some who won't.

"Q. The arrest caused lots of talk and these facts you are speaking of were generally discussed? A. Yes, sir.

"Q. That they were implicated in the murder?

"By the Court: Was it pretty generally known at that time that the murder had been committed? A. Yes, most everybody here knew it; that is, all the officers, I think. I don't think there were any of them but what knew it.

"By Mr. Delaney: I will ask you if you didn't give this information to Mr. Geddes and ask him to withhold it from publication until you could look up some further facts and also locate Jones? A. Yes, that is a fact, too, until we heard if Jones were arrested.

"Q. And the Republican did hold it up? A. I think it was one or two days, I am not sure?

"Q. Held up at the request of the officers? A. Yes.

"Q. Now in the meantime where was Carroll after you had had Mr. Geddes hold up the publication? A. That was right at the time we arrested Carroll and had him in jail and were waiting to hear from George. He was in jail a day or so before this article appeared. We only kept him from one evening until the next day sometime. We had Duffner brought up to see him.

"Q. Geddes withheld the publication at your request until you got these further facts? A. He withheld publication for one issue, at least, I think. One is all I remember.

"Q. Did or not Carroll make contradictory verbal state-

ments as to when he left Nixa, different from the writing he gave?

"By the Court: Go ahead and state anything that induced you to believe he might be the man.

"A. Well, I will go ahead and explain just how he told it to me if you will let me. Charley first stated that they stopped with Dug Chapman while he was down there.

"Q. Did he make any statement different from the written one? A. Yes, sir. I wanted to go ahead and explain it. He said that they first stopped at Chapman's and Bill Myers' and stayed there, and I asked him if he stayed any place else, and so next morning or possibly that night I went to the jail and got him to give a written statement of each date and place, and it is here.

"Q. Was that different about his movement in Christian county? A. Yes, there was difference. I have been an officer ten or eleven years. Green was constable. I was working under him. We were working on this case."

H. S. Geddes, the reporter, testified as follows:

"I am twenty-six years of age. Newspaper man on twenty-second last September. Nine years experience. Was at that date working for the Springfield Republican. I heard of killing of Duffner. We published account of killing on next or second day after it happened. Killed on September 15. I knew of the killing long before this article was published. I wrote it.

"Q. Tell whether or not you believed at that time that Carroll and Jones were the real murderers? A. Yes, I believed it firmly.

"Q. Did you write that article intending malice towards them or intending just to defame them? Why did you write it and publish it? A. Because I believed it was true.

"Q. What ground had you in mind for believing it true? Tell all the facts and circumstances that came to your knowledge? A. Several days before the article appeared

Foster Burns—I asked him if he heard anything about as to who did it. I knew he was on the lookout for the murderers and he said 'Yes, I wouldn't be surprised in a couple of days, but what I would have something pretty good for you,' and about 11:30 o'clock of the night Carroll was arrested I met Burns and I knew it was unusual for him to be out at that time of night and I asked him again if he had heard anything. It was my business to be out at night up to two or three o'clock. He had at first told me that he would tell me something next day. I told him I wanted it then. He told me that he had arrested Carroll and that Jones had gone back to Dallas county, and that he had notified the officers there, at Buffalo, to arrest Jones, and that he had evidence which showed beyond a doubt that they were the guilty parties, and I asked him what it was, and he told me all about it, and said they had found the bloody shirt, and told me about finding these tin cups with the names on them, and the relationship, that Jones was the cousin of these children, and he told me that Jones had a bad reputation, that he come from a bad family and told me all about his brothers and that Carroll was Jones' cousin.

"Q. Did he say anything about the powder burns or pistol marks on the shirt? A. No, I don't remember that. He told me about the blood on the shirt.

"Q. Did he tell you about consulting the county officer, Mr. Wear? A. Yes, sir. He said Mr. Wear advised him to make the arrest. I knew Mr. Wear was prosecuting attorney of the county.

"Q. Did you rely upon these statements and believe them to be true when you published this article? A. Oh, yes, I thought there was no way out of it for Jones and Carroll, I had never seen them. Never saw Jones until yesterday. I had never heard of them until after the murder. A man from Dallas county, I forget his name, told me the story of the killing, and about the Jones boys living in the neighborhood, and that probably it was done—that these Jones boys,

one or two of them down in Texas, may be, had come home and they had done it, and they were looking for them. I remember now when I first got the story.

"Q.  A man came from Dallas county with Lohmeyer? A.  Yes.

"Q.  Now tell what the man said about the suspicions in the country there?  A.  He said they believed the Jones boys were in that neighborhood and had returned home and that they were outlaws and that it was believed they had committed this crime.

"Q.  And that fact was in your mind, also?  A.  Yes.

"Q.  So, the first you heard of the Jones name connected with the tragedy was a rumor that came from Dallas county?  A. . Yes, before ever I talked with Burns about it.

"Q.  Did he tell you in this conversation what these other Jones boys were accused of?  A.  Well, murder I think.

"Q.  To refresh your memory, your article so states. Is that a fact?  Did he tell about one of them being in a killing scrape with the sheriff in Texas?

"Objected to as irrelevant, incompetent and immaterial.

"By the Court:  Q.  They say it is in this article. Now had you heard about the murder there before you wrote it? A.  Oh, yes; this man from Dallas county told me that.

"Q.  He first gave you the information?  A.  He told me all about the Jones boys' reputation and what they were wanted for there.

"By Mr. Delaney:  Do you know how many of the Jones boys there are?  Three of them?  A.  I think he said two.

"Q.  Did you hear anything before you published this article about their making contradictory statements of where they were going when they were at the Farmers' Home?  A. Oh, yes.  Burns told me all about that.  Here is one thing I didn't explain, that is, that Burns told me not to publish

the article that very morning that he arrested Carroll, and I agreed with him not to do it; but I said 'Why, the Leader will get it,' 'No,' he says, 'we won't say anything about that,' and that is the reason we didn't publish it. I was afraid the next morning and along about 10 o'clock I went to him and I told him that the Leader would get this, because I had heard a number of places that Carroll was arrested; he says, 'Yes, I am afraid they will get it,' and I thought sure the Leader would get it; and I went out to the race track and the Leader man came out there and he heard it out there about three o'clock, too late to be published. It was talked of out there. Burns was out there and I knew the Leader man was hot at Burns.

"Q. You wished he had got it first, didn't you? A. Yes, sir.

"Q. You were in Mr. Murray's employ at that time? A. Yes.

"Q. Didn't you tell in a general way all of these facts to him; if he didn't have cognizance in a general way of all these facts before the publication. A. Yes, sir, I told him I had a pretty good story, and I told him what Burns told me and of this arrest being made. Of course, we have to depend upon officers for these things.

"Q. Had you any malice in writing or publishing this article? A. No, sir.

"Q. Or any ill-will toward him? A. No, sir. I never knew him.

"Q. Why did you publish it? A. Because I believed it was true, as we were in the habit of doing articles of that kind.

"Q. And to bring the parties to justice? A. Well, I wanted to. . . .

"Q. Did Jones ever ask you to take any of this back? A. No, I never talked to him about it."

On cross-examination, Geddes testified:

"By Mr. Wright: Q. You got a scoop on the Leader? A. Yes, sir.

"Q. When did you tell Col. Murray about this? A. I think it was next morning or next day.

"Q. Next morning after publication? A. No, before. He never saw the article until after it was in the paper. I told him about it.

"Q. Who was this Dallas county man that told you about this? A. The paper, I think, contains his name that published the first story, all about the killing. ·

"Q. This paper was published by the Republican? A. Yes."

The paper referred to was dated December 2, 1898.

L. H. Murray testified for defendant as follows:

"I am the publisher of the Springfield Republican, and was on September 15.

"Q. Before that article appeared had you heard about these suspicious facts and circumstances that were surrounding Mr. Jones and Mr. Carroll? A. Yes, sir, I had heard something of them.

"Q. In the publication of this article had you any ill-will or malice towards the plaintiff?

"Objected to as incompetent and immaterial.

"Q. Just state all you knew about this thing in your own way. A. Well, the judge expresses it so well that a man can not have malice with any one unless you have had a difficulty with him, but I never heard of the man. I have heard of plenty of Joneses, but I never heard of this one until after the killing of Duffner, after the great murder, and it was in the papers and mouths of everybody, why I heard this man's name mentioned. I didn't know who he was. I just heard there was a man named Jones. I had no idea what neighborhood he lived in, nor what Jones he was, nor anything of the kind. Neither did I of Carroll, I never heard of them, to identify either, therefore I couldn't have malice. It's

against nature to have malice against a man you never heard of and have never seen; in fact, you can not hate a man until you have first loved him. Then to come down to the first information that amounted to anything, Mr. Lohmeyer brought a gentleman into the office in the night and told us about the murder. He seems to have been a friend and acquaintance and to have done some business for Duffner, and was perhaps the first man in town to know of the difficulty. This man came to him (Lohmeyer) I reckon, or was sent there; I don't know but he brought him up there and told us about it. Then there was a write up about the murder generally. I don't think either Carroll or Jones were mentioned in that connection at all. If they were I have forgotten it. Then Mr. Burns, the deputy constable, should have told Mr. Geddes that conversation, I didn't hear that. I did the other, that he was on the trail of these men, etc., and so on, and that he must not publish it until another issue; that they had then arrested Mr. Carroll, and that they hadn't got Jones, and if it went broadcast, if he was guilty he might escape. So he kept it quiet for them and didn't publish it until the next day. He came back and told us he had a telegram from the sheriff that they had him up there, and then he gave the whole story away and published it the next morning. I never saw the article until I saw it in the paper, but I heard this conversation.

"Q. You heard the circumstances, as stated in this article? A. Yes, sir, as stated in this article, similar to that. The thing I never saw until I saw it in the paper."

In rebuttal the plaintiff endeavored and offered to prove by Peyton R. Kelly, that he never told Burns, the deputy constable, any of the matters that Burns swore he, Kelly, had told him. The court excluded the testimony and the plaintiff preserved an exception.

The instructions given and refused will be considered hereinafter. The jury found for the defendant, and plaintiff appealed.

## I.

The publication complained of is libelous per se, particularly the part of the head line, "George Jones implicated. He is robber number three who killed the farmer. He has skipped the country," and the part of the body of the publication, "Officer Burns telegraphed to Buffalo, yesterday morning to the sheriff notifying him to arrest George Jones, who is robber number three, the one who killed Duffner." Being libelous per se, the law implies malice. [Buckley v. Knapp, 48 Mo. 161; Hall v. Adkins, 59 Mo. 144; Price v. Whitely, 50 Mo. 439; Mitchell v. Bradstreet, 116 Mo. 226; Callahan v. Ingram, 122 Mo. l. c. 369.] "Malice whether express or implied means the same, the only difference being in the establishment of it. When malice is implied from the words spoken or published, the burden is on the defendant to prove lawful justification or excuse, or the absence of a malicious intent." [Callahan v. Ingram, supra.] "The absence of a malicious intent" here spoken of is not a complete defense; it is admissible only in mitigation of damages. [Callahan v. Ingram, 122 Mo. l. c. 373, citing with approval, McGinnis v. Knapp, 109 Mo. 148; Newell on Defamation, Slander and Libel, p. 301, sec. 22, and Odgers on Libel and Slander, 317. See also Wozelka v. Hettrick, 93 N. C. 10.] In Callahan v. Ingram, supra, l. c. 374, this court, per MACFARLANE, J., said: "We think evidence of intention and motive of defendant was admissible for the purpose of mitigating the punishment, by way of exemplary damages; but the jury should have been cautioned not to allow such evidence to operate as a defense to the action, or to mitigate the actual damages sustained.

The answer is a general denial and a plea in mitigation. The ruling of the trial court upon the motion to strike out the portion of the answer pleading in mitigation was proper. There are some matters stated therein which are properly ad-

missible in mitigation, and which, if proved, would and should diminish the damages, and therefore the motion to strike out the whole plea was properly overruled.

"Newell on Slander and Libel (2d Ed.), chap. 26, sec. 62, et seq., p. 882, lays down the rule that, "Where a defendant does not justify he may mitigate the damages in two ways: first, by showing the general bad character of the plaintiff; second, by showing any circumstances which tend to disprove malice, but do not tend to prove the truth of the charge." And in section 63, the author quotes from Storey v. Early, 86 Ill. 461, where, after stating the rule above, the Supreme Court of that State held that "this qualification excludes not only such circumstances as the law recognizes as competent evidence tending to prove the truth of the charge, but all circumstances which, in the popular mind, tend to cast suspicion of guilt upon the plaintiff." The same author in the same section cites Marker v. Dunn, 68 Iowa 720, holding that: "Where slanderous words do not, on their face, purport to be spoken on the authority of another, but are spoken as of defendant's own knowledge, it can not be shown in mitigation of damages that they originated with another."

And in section 78 (p. 901) the author says: "As a rule, unless the matter complained of be privileged, the motive or intention of the speaker or writer is immaterial to the right of action. The law looks only at the words employed and their effect on the plaintiff's reputation. But in all cases the absence of malice, though it may not be a bar to the action, may yet have a material effect in reducing the damages. The plaintiff is still entitled to reasonable compensation for the injury he has suffered; but if the injury was unintentional, or was committed under a sense of duty, or through some honest mistake, clearly no vindictive damages should be given. In every case, therefore, the defendant may, in mitigation of damages, give evidence to show that he acted in good faith and with honesty of purpose, and not maliciously. He may show

that the remainder of the libel not set out in the pleadings modifies the words sued on, or that other passages in the same publication qualify them. But he may not put in passages contained in a subsequent and distinct publication, unless the words sued on are equivocal or ambiguous. The fact that the defendant did not originate the calumny, but innocently repeated it, is admissible if he gave it as hearsay and named his authority when he repeated it, but not otherwise."

The sum of the rule is this, if the publication is false and the plaintiff has suffered actual damages, he is entitled to recover such damages, no matter how innocently or with what purpose, intent or motive the defendant acted, but if the defendant acted in good faith and without malice, this fact mitigates his punishment and diminishes the exemplary damages the plaintiff is entitled to recover. Or otherwise stated, the plaintiff is entitled to compensatory damages but the defendant's punishment is lessened because of want of malice. But in all such cases it is the duty of the trial court to caution the jury not to allow evidence of mitigation to operate as a defense to the action, or to mitigate the actual damages sustained. [Callahan v. Ingram, 122 Mo. l. c. 374.]

In this respect the trial court fell into error by refusing the plaintiff's instruction, "You are instructed that in this case there is no justification pleaded, but only a general denial and a plea of mitigation, and the publication is admitted in the pleadings. Under the evidence and the pleadings the defendant can only mitigate the damages." This instruction was right as far as it goes, but the plaintiff was entitled to even a stronger declaration of the law, to the effect that the mitigation must not be taken as a defense nor as mitigating the actual damages, but could only reduce the punitive damages.

The fact that a plea in mitigation may rest upon hearsay testimony, that is, that some one told the defendant and he believed it and acted in good faith, emphasizes the imper-

Vol 167 mo—4

ative necessity for carefully instructing the jury as to the nature, effect and extent of a plea in mitigation, for unless so instructed the untrained minds of the laymen are likely to be confused and misled into accepting such mitigating circumstances as a complete defense, and so not only temper the defendant's punishment, but also in so doing deny compensation to the plaintiff for the wrongs he has suffered at the hands of the defendant. The answer and the testimony set out so fully herein illustrate the necessity of properly instructing, or, more correctly speaking, advising, the jury in libel cases. To illustrate: First. The answer alleges that Kelly became suspicious of Carroll and Jones, and noticed their strange manner, their nervousness, their muddy clothes, and that the shirt of one of them was torn and bloody, and after they left his house he communicated his suspicion to the constable and deputy constable, etc. It will be observed that this is not averred to be stated upon the information of Burns, the deputy constable, to Geddes, the reporter, but is stated as of the defendant's own information. The trial court permitted the defendant to show that Kelly told the reporter these things, notwithstanding it was not averred in the answer that he had done so, and then refused to permit the plaintiff to show by Kelly that he never told the reporter anything of the kind. This ruling was based upon the erroneous conception of the pleadings that the issue was that Kelly told the deputy constable and he told the reporter who was the *alter ego* of the defendant, and therefore, it was immaterial whether the facts stated were true or not. The trial court erred in this respect. For the issue was not so framed. It was averred that such was the fact, and not that the deputy constable told the reporter that Kelly told him that such was the fact. Being alleged as a fact that Kelly told the deputy constable, it was competent for the plaintiff to show by Kelly that he never so told the deputy constable. Under this issue it was the fact stated by Kelly, and not what the deputy constable told the

reporter that Kelly told him was the fact, that was to be inquired into. This shows that even a court may fail to distinguish between the various kinds of pleas in mitigation, and illustrates the necessity of clearly informing the jury as to what constitutes matters of defense and what only mitigating circumstances.

*Again.* It is alleged in the answer that Burns, the deputy constable, "knew the Jones family and knew that the reputation of plaintiff was not good, and said Burns then found the valise kept by plaintiff and in the same was found some stale bread and muddy clothing and a torn shirt with blood thereon, and also on a shirt was found the imprint of the muzzle of a freshly discharged pistol; that thereupon said officers submitted all of said facts to Hon. A. H. Wear, prosecuting attorney of Greene county, who stated as his opinion that the facts justified an arrest," etc. Here again these matters are alleged as facts within the defendant's own knowledge of such occurrences, and not merely hearsay. The testimony wholly failed to support this allegation in the following respects. 1st. If Burns knew the reputation of the plaintiff it is not disclosed, for he was not even asked if he did, and he never said his reputation was bad. The only witness who was interrogated as to the plaintiff's reputation was W. H. Ruth, the sheriff of Dallas county, and here is what he said: "Q. You may state what his general reputation is as a peaceable, moral man? A. I never heard anything, I think, more than he gets drunk once in a while. Q. How is he generally regarded as to being a good citizen, what the people think? A. I don't think I can answer. Q. Did you know his brother, Jim? A. Yes, sir." This and this only is the evidence, or more properly speaking, the lack of evidence, to support the statement in the answer that Burns knew that the plaintiff's reputation was bad. 2d. It is alleged that the deputy constable submitted all the alleged facts to the prosecuting attorney of Greene county and that he stated that in his

opinion the facts justified an arrest.   There is not a word of
testimony in this case that the prosecuting attorney gave any
such advice.   Upon this branch of the case the record dis-
closes the following as a part of Burns' testimony:   "Q.   You
submitted these facts to Mr. Wear, the prosecuting attorney?"
The record discloses no answer whatever to this question.  Pro-
ceeding:   "Q.   At that time did you know or think you knew
the reputation of these men in Dallas county?   A.   *No, sir.*
I knew George when we were little boys.   Q.   From the facts
you were possessed of, did you make the arrest?   A.   Yes.
Q.   And after having the talk with Wear?"   [No talk with
Wear is disclosed.]   "A.   Yes, *I thought I had plenty of evi-
dence to warrant the arrest.*   Q.   You wouldn't have arrested
them if you hadn't believed you were on the right track?   A.
I hardly would.   I had nothing against the boys."

This testimony shows that Burns did not know the plain-
tiff's reputation to be bad; that the prosecuting attorney did
not advise that the facts justified an arrest, in fact does not
show what, if any, facts were submitted to the prosecuting at-
torney, but on the contrary shows that Burns expressly testified
that he did not know the plaintiff's reputation or Carroll's repu-
tation, and that he did not act on the advice of the prosecuting
attorney in making the arrest, but acted on his own motion.
And this is the result:   Burns arrested Carroll, without a
warrant, and he was discharged the next day because Otto Duff-
ner, the son of the murdered farmer, declared that he was not
one of the three men who were engaged in the murder.   Burns
telegraphed the sheriff of Dallas county to arrest the plaintiff,
and he was arrested without a warrant.   The record does not
show what became of the arrest, but from the existence of this
suit, it is fair to presume he was discharged.   At any rate, at
the trial of this case Mrs. Duffner distinctly testified that the
plaintiff was not one of the three men engaged in the murder.

It is too clear for discussion that the arrest of the plaintiff
was a gross abuse of authority and without any evidence that

raises even a reasonable suspicion of his connection with the murder. Counsel for the defendant went, therefore, entirely outside of the limits of legitimate debate when they charged that the plaintiff murdered old man Duffner, and the court erred in not rebuking them for so doing, and in not telling the jury there was no evidence to support such a charge.

All of these things took place under a plea in mitigation. If such a plea opens the door to such proceeding it is so broad and all-sufficient that a plea of justification is superfluous and too narrow and embarrassing.

Under the Constitution of this State the jury in a libel case are the judges of the law and the fact. [Heller v. Pulitzer Publishing Company, 153 Mo. 205.] But the province of the court is not entirely taken away. Because of this provision of law, and because of the character and scope of the various excusatory and mitigating pleas that may be interposed, it is the more necessary that the court should properly and carefully advise the jury as to the law. [Heller v. Publishing Co., 153 Mo. l. c. 215.] And when the trial court errs in so doing it is necessary to the protection of the rights of the citizen, and to the proper administration of the law, that this court should correct the error. The liberty of the press must be assured, but at the same time the liberty and rights of the people must be protected. The publication in this case is the product of a too credulous reporter and of a reckless deputy constable and would-be detective.

The judgment of the circuit court is reversed and the cause remanded for further trial in conformity herewith. All concur.